# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2396
_____

Abdulhakim Muhammad

*Plaintiff - Appellee*

v.

Joshua Mayfield, Religious Services Administrator, Arkansas Department of Correction (originally named as Mark Wheeler); Jeremy Andrews, Warden, East Arkansas Regional Max Unit (originally named as Randy Watson); Wendy Kelley, Director, Arkansas Department of Correction (originally named as Wendy Kelly)

*Defendants - Appellants*

------------------------------

Muslim Advocates

*Amicus on Behalf of Appellee*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff Division
_____

Submitted: April 17, 2019
Filed: August 13, 2019
_____

Before SHEPHERD, MELLOY, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

Abdulhakim Muhammad ("Muhammad"), an inmate at the Arkansas Department of Corrections ("ADC"), filed suit under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc-1 to 2000cc-5, and the First and Fourteenth Amendments. He sought injunctive relief against various ADC officials ("Officials") for allegedly refusing to provide him with a daily serving of "halal" meat in accord with his personal religious beliefs. The district court held a bench trial and then granted an injunction in favor of Muhammad. Because we conclude Muhammad failed to exhaust his administrative remedies, we reverse.

## I. Background
## A. Factual History

Muhammad has been serving eleven life sentences and an additional 180 months of imprisonment at ADC since 2011. He is a Sunni Muslim and believes he must observe a halal diet based on the example of the Prophet Muhammad. He says halal foods include meats from herbivorous animals (e.g., chickens, cows, sheep, and goats) which have been slaughtered according to a particular ritual, as well as kosher meats, fish, vegetables, and fruit. Muhammad particularly believes he must eat halal *meat* at least *once daily* as part of his religious observance. This belief is not required by Islam's texts, according to the trial testimony of Imam Mahmoud Hassan, a professor of Islamic studies and spiritual leader of a Muslim community in Arkansas.[1] Rather, it is a personally distinct interpretation by Muhammad.

As this case turns on ADC's policies and procedures, we briefly summarize them here. ADC offers five categories of meals to all inmates: (1) standard, (2) pork-

_____

[1]Muhammad's beliefs are thus different from those we considered in *Patel v. U.S. Bureau of Prisons*, where the plaintiff inmate sought "a halal diet consisting of either halal meat or halal vegetarian entrées, not just halal meat." 515 F.3d 807, 814 n.8 (8th Cir. 2008) (emphasis omitted).

free, (3) vegetarian, (4) vegan, and (5) common fare. The standard option includes meat which has not been certified as halal. ADC's "master menu" indicates it serves fish-based meals as part of its standard option approximately twice per week.[2] The common fare option does not include meat but instead serves a meat substitute which is intended to satisfy kosher standards.

ADC developed the meatless common fare option with the assistance of a chaplain in an attempt to satisfy the dietary requirements of multiple religious groups. The common fare option replaced an earlier plan that had served pre-packaged kosher meats to inmates requesting a kosher diet. The earlier plan had been implemented in 2003 after a federal district court ordered ADC to satisfy an inmate's request for a kosher diet under RLUIPA and the First Amendment. *See Love v. Evans*, No. 2:00-CV-00091, (E.D. Ark. Nov. 20, 2001), *aff'd*, *Love v. McCown*, 38 F. App'x 355, 357 (8th Cir. 2002) (unpublished). In 2006 the same district court ordered ADC, in light of *Love*, to pay damages to a different inmate who temporarily failed to receive a requested Kosher diet. *See Fegans v. Norris*, No. 4:03-CV-00172, 2006 WL 6936834, at *2 (E.D. Ark. Aug. 25, 2006), *aff'd*, 537 F.3d 897, 908 (8th Cir. 2008). ADC switched to the meatless common fare plan in 2008 with the intent of maintaining compliance with *Love* and *Fegans* while also satisfying other types of religious diets.

ADC also maintains a procedure for requesting "special religious diet[s]" under Administrative Directive ("AD") 13-83 ("Religious Diet Policy"), which was made effective on November 22, 2013. The Religious Diet Policy allows an inmate to submit an accommodation request to ADC's chaplain. If approved by the chaplain, the request will be forwarded to ADC's supervisor of food services.

ADC maintains a separate procedure for inmate grievances under AD 12-16, which is titled "Inmate Grievance Procedure" and was effective as of May 28, 2012.

---

[2]According to Muhammad, fish and kosher meat qualify as halal meat.

This procedure states it is ADC's policy "to provide inmates in its custody an administrative mechanism for the resolution of complaints, problems and other issues." The Inmate Grievance Procedure specifically provides for grieving, among other things, "[a] policy applicable within [an inmate's] unit/center of assignment that personally affects the inmate." The Inmate Grievance Procedure provides a three-step process for resolving inmate complaints. If no one responds at Steps One and Two — or if the responses at those steps are dissatisfactory — an inmate may appeal to the level of ADC's "Chief Deputy/Deputy/Assistant Director" at Step Three.

Since arriving at ADC in 2011, Muhammad has submitted four grievances alleging ADC's dietary options violate his religious beliefs. These grievances include: (1) Varner Super Max number ("VSM") 13-00336, complaining the pork-free option's servings of *non*-halal bologna and salami[3] actually contained pork; (2) VSM 13-03225, complaining the common fare and other non-pork options were cooked with the same utensils used to serve pork and thus were cross-contaminated; (3) VSM 13-03485, raising the identical cross-contamination issue; and (4) VSM 14-00491, citing *Love* and *Fegans* and complaining ADC engaged in discrimination by failing to provide "us Muslims with . . . the Halaal diet"[4] while providing Jewish inmates with a kosher diet. Muhammad fully appealed only the first and fourth grievances. As to the first, the Director's office responded that neither the salami nor bologna contain pork. As to the fourth grievance, an ADC official affirmed the warden's response that ADC provides the common fare option for inmates with religious diets.

Muhammad also submitted three accommodation requests to the chaplain under the Religious Diet Policy, although the record contains only the chaplain's responses

---

[3]Muhammad admitted at trial he has regularly eaten meats in the pork-free diet which are not halal, stating: "I have no other choice. I eat it or starve."

[4]On appeal the parties agree the proper spelling is "halal," but we leave unaltered Muhammad's spelling of "halaal" when quoting his lower-court documents.

to these requests.  At trial, Muhammad testified his first request asked for "the halal diet,"[5] his second request asked if he could supplement vegetarian meals with fish, and his third request asked for a "[h]alal diet, halal meat in particular."[6]  The chaplain rejected each request.

## B.  Procedural History

Muhammad filed this lawsuit pro se in 2015 after the chaplain's response to his last accommodation request.  He raised claims under RLUIPA and the First and Fourteenth Amendments, arguing ADC refused to provide him with a "Halaal and Adequate Diet" and required him to eat "unlawful meat."  For relief, Muhammad requested "pre-packed halaal food" and that the district court order "ADC to provide Halaal meals or to transfer [him] to a prison which does."

The Officials answered and raised the affirmative defense that Muhammad failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") of 1995, 42 U.S.C. § 1997e(a).  Muhammad then filed an amended complaint alleging, in part, he had exhausted his administrative remedies because his grievance in VSM 14-00491 had satisfied the steps required by the Inmate Grievance Policy.

After the parties filed cross motions for summary judgment, a magistrate judge observed that Muhammad appeared to argue for the first time in summary judgment

---

[5]Muhammad submitted this request under a predecessor policy to ADC's Religious Diet Policy.  For purposes of this appeal and in accord with the district court, we treat it as having been submitted under the Religious Diet Policy.

[6]Muhammad made his second and third accommodation requests to the chaplain under the Religious Diet Policy *after* his fourth grievance under the Inmate Grievance Procedure had been denied.

briefing that "he must not only have a halal diet, but also eat halal meat." The magistrate judge rejected the argument that RLUIPA and the Free Exercise Clause require ADC to provide inmates with halal meat every day. The magistrate judge also concluded general halal options were already available to Muhammad. Finally, the magistrate judge rejected Muhammad's summary judgment argument that ADC was violating the First Amendment's Establishment Clause and the Fourteenth Amendment's Equal Protection Clause by failing to provide Muslims with a halal diet despite having provided a kosher diet to Jewish inmates. The magistrate judge thus recommended granting summary judgment for the Officials and dismissing Muhammad's claims with prejudice.

The district court disagreed with the magistrate judge in part and set the case for trial with respect to whether ADC's refusal to provide Muhammad with daily halal meat violated RLUIPA and the Free Exercise Clause. The district court did, however, adopt the magistrate judge's recommendation to grant partial summary judgment to the Officials on Muhammad's Establishment Clause and Equal Protection Clause claims.

During the one-day bench trial, Muhammad testified his faith does not excuse him from eating halal meat on grounds of unavailability because he knows fish is "available" at ADC two or three times a week.[7] ADC Director Wendy Kelley then testified she was surprised by Muhammad's testimony. Specifically, Director Kelley stated: "[W]hat I heard [Muhammad] request today was a vegetarian diet with fish that we already have served for one of those meals a day. If that was truly his request, we could meet that. But that was never my understanding of his request before today."

The district court ruled the Officials failed to show Muhammad did not exhaust his administrative remedies. The district court explained as follows:

---

[7]Imam Hassan testified Muslims should eat halal meat *if* it is available.

Because [the Religious Diet Policy] specifies no appeal process, because it was promulgated after the [Inmate Grievance Procedure] and because the specificity of [the Religious Diet Policy] overrides the generality of [the Inmate Grievance Procedure]; based on the content of the grievances Mr. Muhammad filed and exhausted prior to filing suit; and based on the totality of the circumstances presented here regarding Mr. Muhammad's grievances and requests for accommodation, the Court concludes defendants have failed to prove the affirmative defense of nonexhaustion.

The district court also concluded in the alternative that Muhammad was "excused" from the exhaustion requirement. The district court reasoned that no one followed up with Muhammad after he submitted his grievances, no evidence showed formal grievances are reviewed at the requisite level of authority to grant special dietary accommodations, and the chaplain denied his request for vegetarian meals supplemented with fish.

The district court finally ruled in favor of Muhammad on his RLUIPA and First Amendment claims. The district court issued an injunction ordering the Officials to provide Muhammad with one serving of fish three or four days per week and one serving of halal or kosher beef, chicken, or turkey the other three or four days per week.

The Officials now appeal, requesting us to first consider whether Muhammad exhausted his administrative remedies. They also challenge the district court's ruling on Muhammad's RLUIPA and Free Exercise claims and the scope of injunctive relief.

## II. Discussion

In an appeal from a bench trial, we review factual findings for clear error and legal conclusions de novo. *See Kaplan v. Mayo Clinic*, 847 F.3d 988, 991 (8th Cir. 2017).

We begin with the text of the PLRA. This statute provides "[n]o action shall be brought with respect to prison conditions under . . . any . . . Federal law, by a prisoner confined in any . . . correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also* 42 U.S.C. § 2000cc-2(e) (providing that nothing in RLUIPA "shall be construed to amend or repeal the [PLRA]"). The Supreme Court has instructed that the exhaustion requirement is "mandatory," *Woodford v. Ngo*, 548 U.S. 81, 85 (2006), and that it was enacted "to reduce the quantity and improve the quality of prisoner suits . . . afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002).

Applying this statute here, we first consider whether administrative remedies were "available" to Muhammad. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). If so, we then consider whether Muhammad *properly* exhausted his administrative remedies. *See Woodford*, 548 U.S. at 93.

### A. Availability of Remedies

The Supreme Court has observed that "[a]n inmate . . . must exhaust *available* remedies, but need not exhaust unavailable ones." *Ross*, 136 S. Ct. at 1858 (emphasis added). The Supreme Court recognizes at least three circumstances where an administrative remedy is "not capable of use" and thus unavailable: (1) where "it operates as a simple dead end—with officers unable or consistently unwilling to

-8-

provide *any* relief to aggrieved inmates," *id*. at 1859 (emphasis added); (2) where the "administrative scheme" is "so opaque" as to be practically "incapable of use," *id*.; and (3) where "administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860. Muhammad raises arguments under the first and second circumstances, and we address each in turn.

First, Muhammad argues ADC's administrative remedies were a "dead end" because the Officials' actions (or lack thereof) show there was no possibility of obtaining daily halal meat. But that is not the correct test. Rather, the PLRA requires exhaustion of "such administrative remedies *as are available*." 42 U.S.C. § 1997e(a) (emphasis added). As a result, the Supreme Court has recognized that as long as "the administrative process has authority to take *some action* in response to a complaint, [even if] not the remedial action an inmate demands," administrative remedies are "available." *Booth v. Churner*, 532 U.S. 731, 737–38, 741 (2001) (emphasis added); *see also Ross*, 136 S. Ct. at 1859 (stating the question is whether "the facts on the ground demonstrate that no . . . potential exists" for *some* relief). Here, Director Kelley testified at trial that if Muhammad's request was actually for vegetarian meals supplemented by available fish, "we could meet that." Because ADC regularly serves vegetarian meals and fish, and because Muhammad never filed a formal grievance requesting some combination of the two, we have no reason to doubt Director Kelley's claim. Accordingly, we cannot say the Officials lacked authority to provide *some relief* in response to Muhammad's request.

Muhammad contends no such relief was available because no ADC official personally spoke to him in response to his grievances, and because he was consistently told current meal plans were his *only* options. *See Porter v. Sturm*, 781 F.3d 448, 452 (8th Cir. 2015) (stating exhaustion is not required where officials have failed to adhere to their own grievance procedures or have prevented prisoners from using those procedures). We disagree. The Inmate Grievance Procedure does not require any

ADC official to personally follow up with a grievant, and Muhammad did receive written responses (even if unsatisfactory) to his fully exhausted grievances as well as to at least one of his unexhausted grievances. Additionally, we cannot say current meal plans were his only possible option where he failed to grieve the chaplain's refusal to allow him a vegetarian diet supplemented with fish. Therefore, we conclude ADC's administrative remedies were not a dead end.

As to the second circumstance, Muhammad argues ADC's administrative scheme was practically incapable of use because "no record evidence" showed inmates were on notice they needed to file a grievance under the Inmate Grievance Procedure if they were unsatisfied with the chaplain's responses under the Religious Diet Policy. But both procedures are in the record, and the Inmate Grievance Procedure expressly states an inmate may grieve a "policy" as well as "[a]n action of an employee[], contractor, or volunteer[]" at his facility "that personally affects the inmate." Additionally, we note the PLRA eliminated an earlier requirement in 42 U.S.C. § 1997e(a) that "administrative remedies be '*plain*, speedy, and effective.'" *Ross*, 136 S. Ct. at 1858 (emphasis added) (quoting *Nussle*, 534 U.S. at 524). As a result, "procedures need not be sufficiently 'plain' as to preclude any reasonable mistake," as long as an "ordinary prisoner can make sense of what it demands." *Id.* at 1859. Given the plain text of the Inmate Grievance Procedure and the fact it was available to Muhammad (as is evident from the four grievances he did file), we conclude ADC's administrative scheme was not practically incapable of use.[8]

---

[8]We also disagree with amicus curiae Muslim Advocates that administrative remedies were unavailable under the third *Ross* circumstance based on the theory that ADC's grievance procedures were an exercise in "blatant gamesmanship." We cannot say ADC's procedures were designed to "trip up all but the most skillful prisoners," *Ross*, 136 S. Ct. at 1860 (quoting *Woodford*, 548 U.S. at 102) (cleaned up), where Muhammad simply chose not to formally grieve the chaplain's denial of his requests for daily halal meat despite having previously filed four grievances.

Therefore, we hold Muhammad was required to exhaust his administrative remedies because there was a potential for some relief.

## B. Proper Exhaustion

Where administrative remedies are available, the Supreme Court has observed the PLRA requires "proper exhaustion" in accord with a prison's "critical procedural rules." *Woodford*, 548 U.S. at 90. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, not the PLRA, that define the boundaries of proper exhaustion." *King v. Iowa Dep't of Corr.*, 598 F.3d 1051, 1054 (8th Cir. 2010) (quoting *Jones v. Bock*, 549 U.S. 199 (2007)). Muhammad argues he met the proper-exhaustion requirement for several reasons, and we again address each in turn.

First, Muhammad argues his requests for accommodations under the Religious Diet Policy constituted proper exhaustion on at least two grounds: (a) the PLRA only requires exhaustion of *remedies*, such as were available under that policy, not "grievance processes"; and (b) alternatively, the Religious Diet Policy was promulgated later in time and is more specific than the Inmate Grievance Procedure, rendering it a valid procedure for exhausting administrative remedies. We disagree.

The Supreme Court explicitly rejected Muhammad's first reason in *Booth*, where it held that under the plain terms of the PLRA, the "administrative remedies" an inmate must exhaust are the "procedural means" to relief and "not the particular relief" itself. 532 U.S. at 739. The Supreme Court explained "the word 'exhausted' has a decidedly procedural emphasis," and that "one 'exhausts' processes, not forms of relief." *Id*. Applied here, Muhammad was required to exhaust ADC's proper grievance procedures regardless of the forms of relief potentially available under the Religious Diet Policy.

-11-

We also reject Muhammad's alternative reason that the Religious Diet Policy was, in and of itself, a proper and complete grievance procedure. Recalling "it is the prison's requirements . . . that define the boundaries of proper exhaustion," *King*, 598 F.3d at 1054 (quoting *Jones*, 549 U.S. at 218), ADC makes clear the Inmate Grievance Procedure is the *exclusive* means for exhausting administrative remedies prior to filing a federal claim. The Inmate Grievance Procedure includes a subsection titled "Prison Litigation Reform Act Notice" and provides that inmates "must exhaust their administrative remedies as to all defendants at all levels of the grievance procedure before filing a Section 1983 lawsuit." This provision makes it sufficiently clear the Inmate Grievance Procedure applied to Muhammad's RLUIPA and constitutional claims. *See* 42 U.S.C. § 1997e(a) (requiring exhaustion before bringing an action regarding prison conditions "under section 1983 . . . or any other Federal law").

We also see no inconsistency between the Inmate Grievance Procedure and the later-enacted Religious Diet Policy. Nothing in the Religious Diet Policy indicates it is a *grievance* procedure rather than (or in addition to) a vehicle for *requesting religious-diet accommodations* to the chaplain. As already noted, it represents the very type of "policy" and authorizes the very types of "action[s] of . . . employees," in this case those of the chaplain, which inmates must grieve under the Inmate Grievance Procedure. Thus, any requests Muhammad made for daily halal meat under the Religious Diet Policy did not constitute proper exhaustion.

Next, Muhammad argues the two grievances he did fully exhaust sufficiently "related to" his federal claim. He notes he complained in the first grievance about having to eat non-halal pork, and that he referenced in the second grievance ADC's liability under the *Love* and *Fegans* cases, which had resulted in ADC temporarily providing daily kosher meat. This argument falls flat. The Inmate Grievance Procedure required inmates to raise "only one problem/issue" per grievance form, but Muhammad's exhausted grievances did not raise the "problem/issue" that he lacked daily halal meat.

His first exhausted grievance form, VSM 13-00336, complained the bologna and salami in ADC's pork-free diet actually contained pork, but Muhammad acknowledged at trial the pork-free diet still contained *non*-halal meats. And Imam Hassan testified at trial that where halal meat is not available, a Muslim can indeed consume even non-halal meat, but "pork can never be consumed." Thus, Muhammad's complaint that the *non*-halal, pork-free diet contained pork raised a decidedly different issue than his federal claim seeking daily *halal* meat.

His second exhausted grievance form, VSM 14-00491, complained ADC was discriminating against "Muslims" by failing to provide them with a "Halaal diet" while "providing Jewish inmates with the Kosher diet" — thus "violating the equal protection clause of the 14th Amendment." However, the fact the district court *denied* Muhammad's Establishment Clause and Equal Protection Clause claim grounded on a similar argument at the summary judgment stage makes evident this was a different issue than the one the district court sent to trial and is before us now. Still, Muhammad argues this grievance referred to ADC's liability in the *Love* and *Fegans* cases and thus made clear he was seeking daily halal meat. But the *Love* and *Fegans* decisions merely required officials at ADC to provide regular kosher *diets* to Jewish inmates. *See Love*, No. 2:00-CV-00091, at *5, 17; *Fegans*, 2006 WL 6936834, at *2. The fact ADC responded by temporarily providing daily, pre-packaged kosher *meat* was a sufficient remedy but not a required one. Therefore, this grievance did not complain about a lack of daily halal meat. Accordingly, Muhammad's two exhausted grievances did not properly exhaust his claim for daily halal meat.

Finally, Muhammad argues his two *unexhausted* grievances (identically complaining about cross contamination of non-pork foods with pork) provided sufficient notice to ADC about his need for daily halal meat. He reasons these grievances *also* complained the common fare diet was not halal because "all meat has to be slaughtered in accord to Islamic rituals." He also notes he wrote a handwritten appeal in the second of these grievances stating that even if the common-fare utensils

-13-

were clean, "the meat is still not halaal." But this argument ultimately fails. Although courts have held "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought," *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002), they have done so in the context of clarifying the factual specificity required in any prison grievance. *See id.; Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004); *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). They do not excuse a failure to properly exhaust. *See Ross*, 136 S. Ct. at 1856 (stating "a court may not excuse a failure to exhaust"). Here, we agree with the district court's finding that Muhammad did not fully appeal these two grievances because he failed to properly follow the steps of the Inmate Grievance Procedure. Therefore, Muhammad's two unexhausted grievances also did not constitute proper exhaustion.

Accordingly, we hold Muhammad failed to exhaust his administrative remedies as required by the PLRA. We thus do not reach whether the Officials violated Muhammad's rights under RLUIPA and the Free Exercise Clause.

## III. Conclusion

For the reasons set forth herein, we reverse the judgment of the district court and remand with instructions to dismiss the case without prejudice.

_____