# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 20-20207

United States Court of Appeals
Fifth Circuit

**FILED**

April 22, 2020

Lyle W. Cayce
Clerk

LADDY CURTIS VALENTINE; RICHARD ELVIN KING,

> Plaintiffs-Appellees,

v.

BRYAN COLLIER; ROBERT HERRERA; TEXAS DEPARTMENT OF
CRIMINAL JUSTICE,

> Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, HIGGINSON, and OLDHAM, Circuit Judges.

PER CURIAM:

This case implicates the State of Texas's response to COVID-19. On April 16, 2020, the United States District Court for the Southern District of Texas issued a reticulated preliminary injunction against the executive director of the Texas prison system and the warden of one of its prisons. The injunction regulates in minute detail the cleaning intervals for common areas, the types of bleach-based disinfectants the prison must use, the alcohol content of hand sanitizer that inmates must receive, mask requirements for inmates, and inmates' access to tissues (amongst many other things). The district court admitted that its injunction "goes beyond" the recommendations of the Centers

No. 20-20207

for Disease Control and Prevention. But in the district court's view, anything less than this injunction—including, presumably, the CDC guidelines—violates the Eighth Amendment. Pursuant to Federal Rule of Appellate Procedure 8, we stay the injunction pending appeal.

I.

As with every other part of the country, our Nation's correctional facilities have not escaped the reach of COVID-19. To mitigate the spread of the virus, the Texas Department of Criminal Justice ("TDCJ") has adopted and implemented several rounds of measures guided by ever-changing CDC recommendations. Plaintiffs are two inmates at the TDCJ Wallace Pack Unit ("Pack Unit"), a prison for the elderly and the infirm. They say TDCJ's measures don't go far enough.

On March 30, 2020, Plaintiffs filed a class action lawsuit on behalf of disabled and high-risk Pack Unit inmates against TDCJ, its executive director, and the warden of the Pack Unit. The complaint alleges violations of the Eighth Amendment's prohibition against cruel and unusual punishment, and of the Americans with Disabilities Act. In addition, Plaintiffs sought a preliminary injunction.

After considering Defendants' written evidence and Plaintiffs' live witness testimony, the district court granted that injunction, finding it likely that Plaintiffs could prove an Eighth Amendment violation. The district court enjoined TDCJ to:

- "Provide Plaintiffs and the class members with unrestricted access to hand soap and disposable hand towels to facilitate handwashing."
- "Provide Plaintiffs and the class members with access to hand sanitizer that contains at least 60% alcohol in the housing areas, cafeteria, clinic, commissary line, pill line, and laundry exchange."

No. 20-20207

- "Provide Plaintiffs and the class members with access to tissues, or if tissues are not available, additional toilet paper above their normal allotment."

- "Provide cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants in sufficient quantities to facilitate frequent cleaning, including in quantities sufficient for each inmate to clean and disinfect the floor and all surfaces of his own housing cubicle, and provide new gloves and masks for each inmate during each time they are cleaning or performing janitorial services."

- "Provide all inmates and staff members with masks. If TDCJ chooses to provide inmates with cotton masks, such masks must be laundered regularly."

- "Require common surfaces in housing areas, bathrooms, and the dining hall to be cleaned every thirty minutes from 7 a.m. to 10 p.m. with bleach-based cleaning agents, including table tops, telephones, door handles, and restroom fixtures."

- "Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television controls, books, and gym and sports equipment."

- "Institute a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic. In the alternative, test all new prisoners entering the Pack Unit for COVID-19 or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available."

- "Limit transportation of Pack Unit inmates out of the prison to transportation involving immediately necessary medical appointments and release from custody."

- "For transportation necessary for prisoners to receive medical treatment or be released, CDC-recommended social distancing requirements should be strictly enforced in TDCJ buses and vans."

- "Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic; (ii) information on how inmates can protect themselves from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other locations, all signage must be posted in every housing area and above every sink."

- "Educate inmates on the COVID-19 pandemic by providing information about the COVID- 19 pandemic, COVID-19 symptoms, COVID-19 transmission, and how to protect oneself from COVID-19. A TDCJ staff person must give an oral presentation or show an educational video with the above-listed information to all inmates, and give all inmates an opportunity to ask questions. Inmates should be provided physical handouts containing COVID-19 educational information, such as the CDC's 'Share Facts About COVID-19' fact sheet already in TDCJ's possession."

- "TDCJ must also orally inform all inmates that co-pays for medical treatment are suspended for the duration of the pandemic, and encourage all inmates to seek treatment if they are feeling ill."

- "TDCJ must, within three (3) days, provide the Plaintiffs and the Court with a detailed plan to test all Pack Unit inmates for COVID-19, prioritizing those who are members of Dorm A and of vulnerable populations that are the most at-risk for serious illness or death from exposure to COVID-19. For any inmates who test positive, TDCJ shall provide a plan to quarantine them while minimizing their exposure to inmates who test negative. TDCJ must also provide a plan for testing all staff who will continue to enter the Pack Unit, and for any staff that test positive, provide a plan for minimizing inmates' exposure to staff who have tested positive."

Prelim. Inj. Order at 2–4 [hereinafter PI Order].

In its memorandum opinion explaining this injunction, the district court acknowledged that "many of the measures ordered in the preliminary injunction largely overlap with TDCJ's COVID-19 policy requirements and recommendations." D. Ct. Op. at 23. Yet the court believed the injunction necessary "to promote compliance" with TDCJ's policy, as well as CDC guidelines. *Id.* at 24. Some of the conduct required of Defendants under the injunction goes even further than CDC guidelines. But the district court found that compliance with those guidelines alone could be constitutionally insufficient. *Id.* at 25–26.

No. 20-20207

The district court stayed its preliminary injunction until April 22, 2020, at 5 p.m. Defendants timely appealed and sought a stay of the preliminary injunction pending appeal.

## II.

When considering a stay, "a court considers four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation omitted). The first two factors are the most critical. *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016).

## A.

We start with TDCJ's likelihood of success on appeal. In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the "subjective and objective requirements" of the Eighth Amendment inquiry. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." *Ibid.* To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837). The "incidence of diseases or infections, standing alone," do not "imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks." *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009). Instead, the plaintiff must show a denial of "basic human needs." *Ibid.* "Deliberate indifference is an extremely

5

high standard to meet." *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020).

TDCJ is likely to prevail on the merits of its appeal. That's for two reasons: (1) after accounting for the protective measures TDCJ has taken, the Plaintiffs have not shown a "substantial risk of serious harm" that amounts to "cruel and unusual punishment"; and (2) the district court committed legal error in its application of *Farmer v. Brennan*.

1.

First, the harm analysis. There is no doubt that infectious diseases generally and COVID-19 specifically can pose a risk of serious or fatal harm to prison inmates. TDCJ acknowledges that fact. And it submitted evidence to the district court of the protective measures it has taken as a result.[1] Those protective measures include many of the things the district court ordered—including "access to soap, tissues, gloves, masks, regular cleaning, signage and education, quarantine of new prisoners, and social distancing during transport." D. Ct. Op. at 24. The legal question is whether the Eighth Amendment requires TDCJ to do more to mitigate the risk of harm.

The district court said yes. It acknowledged the numerous protections TDCJ provided, but it wanted to see "extra measures," such as providing alcohol-based sanitizer and additional paper products. D. Ct. Op. at 26. The district court further acknowledged that the "extra measures" it required "go[] beyond TDCJ and CDC policies." *Id.* at 25. Plaintiffs have cited no precedent

---

[1] The district court made much of the fact that TDCJ did not present "live testimony" at the preliminary-injunction hearing. It's unclear to us why that matters. It long has been true that parties can present evidence at the preliminary-injunction stage with declarations or affidavits. *See, e.g.*, *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993). And, of course, it's the Plaintiffs' burden to prove their entitlement to an injunction, not the Defendants' burden to prove the opposite.

holding that the CDC's recommendations are insufficient to satisfy the Eighth Amendment.

TDCJ also is likely to succeed on appeal insofar as the district court enjoined the State to follow its own laws and procedures. In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), a plaintiff class brought suit under *inter alia* the Eighth Amendment and state law to challenge the conditions at a state facility for people with mental disabilities. *See id.* at 92. The Supreme Court held that the Eleventh Amendment prohibits federal courts from enjoining state facilities to follow state law. *See id.* at 103–23. Here, however, the district court acknowledged that its injunction "largely overlap[ped] with TDCJ's COVID-19 policy requirements and recommendations." D. Ct. Op. at 23. In the district court's view, this was a virtue not a vice because its injunction would "promote compliance" with TDCJ's own policies. *Id.* at 24. *Pennhurst* plainly prohibits such an injunction.

2.

Second, even assuming that there is a substantial risk of serious harm, the Plaintiffs lack evidence of the Defendants' subjective deliberate indifference to that risk. In *Farmer v. Brennan*, the Supreme Court held that deliberate indifference requires the defendant to have a subjective "state of mind more blameworthy than negligence," *Farmer*, 511 U.S. at 835, akin to criminal recklessness, *id.* at 839–40. The district court misapplied this standard. It appeared to think that the question was "whether [the Defendants] reasonably abate[d] the risk" of infection, D. Ct. Op. at 20, or stated differently, "whether and how [TDCJ's] policy is being administered," *id.* at 23.

The district court thus collapsed the objective and subjective components of the Eighth Amendment inquiry established in *Farmer*, treating inadequate

measures as dispositive of the Defendants' mental state. Such an approach resembles the standard for civil negligence, which *Farmer* explicitly rejected. Though the district court cited the Defendants' general awareness of the dangers posed by COVID-19, it cited no evidence that they subjectively believe the measures they are taking are inadequate. To the contrary, the evidence shows that TDCJ has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus. *See* Dkt. 36-7 (declaration of TDCJ Health Services Director); Dkt. 36 at 13–20 (compiling evidence of protective measures taken by TDCJ). Although the district court might do things differently, mere "disagreement" with TDCJ's medical decisions does not establish deliberate indifference. *Cadena,* 946 F.3d at 729.

## B.

TDCJ also has shown that it will be irreparably injured absent a stay. *See Nken*, 556 U.S. at 434. When the State is seeking to stay a preliminary injunction, it's generally enough to say "'[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). The Texas Legislature assigned the prerogatives of prison policy to TDCJ. *See, e.g.*, TEX. GOV'T CODE ch. 501. The district court's injunction prevents the State from effectuating the Legislature's choice and hence imposes irreparable injury.

Moreover, the Supreme Court has repeatedly warned that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Woodford v. Ngo*, 548 U.S. 81, 94 (2006)

(quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973)); *see also Missouri v. Jenkins*, 495 U.S. 33, 51 (1990). Yet the district court in this case imposed a number of immediate demands on TDCJ. Among these is a plan within three days to test all Pack Unit inmates for COVID-19, as well as a new plan to quarantine those who test positive, distribute physical handouts with COVID-19 information to the inmates, clean common surfaces every thirty minutes for fifteen hours each and every day, and to provide masks to all inmates and staff members. As we've said before about such intrusive orders, this one creates "an administrative nightmare" for TDCJ "to comply with the district court's quotas and deadlines." *Ruiz v. Estelle*, 650 F.2d 555, 571 (5th Cir. Unit A June 1981). "[T]he burden upon TDC[J] in terms of time, expense, and administrative red tape is too great" while it must respond in other ways to the crisis. *Ibid.*

The harm to TDCJ is particularly acute because the district court's order interferes with the rapidly changing and flexible system-wide approach that TDCJ has used to respond to the pandemic so far. The TDCJ's Director of Health Services explained this statewide approach in her declaration. *See* Dkt. 36-7. The Director worked with a team of medical directors to develop Policy B-14.52 in response to COVID-19. *Id.* at 2. TDCJ first implemented that policy on March 20, 2020. It was designed "to adhere to guidance issued" by the CDC. *Ibid.* And the policy was then disseminated to staff, placed in the "Correctional Managed Health Care Infection Control Policy Manual[,] and posted on the TDCJ website." *Id.* at 3. But just three days later, the CDC updated its guidance, so TDCJ implemented a revised policy on March 27, 2020. *Id.* at 4. More changes came again on April 2, 2020, and again TDCJ disseminated and implemented the updated policy. *Ibid.* And on April 15, 2020, TDCJ disseminated and began implementation of yet *another* policy. *Id.* at 4–5.

No. 20-20207

TDCJ's ability to continue to adjust its policies is significantly hampered by the preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches. *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11, 28–29 (1905); *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *12 (5th Cir. 2020) (describing COVID-19 as a "massive and rapidly-escalating threat"). And it prevents TDCJ from responding to the COVID-19 threat without a permission slip from the district court. That constitutes irreparable harm.

## C.

The remaining two factors of the stay standard are the balance of the harms and the public interest. *See Nken*, 556 U.S. at 426. Both weigh in favor of staying the district court's injunction. There is no doubt that COVID-19 poses risks of harm to all Americans, including those in the Pack Unit. But the question is whether Plaintiffs have shown that they will suffer irreparable injuries *even after* accounting for the protective measures in TDCJ Policy B-14.52. Neither the Plaintiffs nor the district court suggest the evidence satisfies that standard. And "[b]ecause the State is the appealing party, its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (citing *Nken*, 556 U.S. at 435). Therefore, TDCJ has satisfied all four requirements of the stay standard.

## III.

Plaintiffs also face several obstacles to relief under the Prison Litigation Reform Act ("PLRA"). Two bear emphasis at this stage: exhaustion and narrowness.

## A.

First, exhaustion. The PLRA requires inmates to exhaust "such administrative remedies as are available" before filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). This exhaustion obligation

is mandatory—there are no "futility or other [judicially created] exceptions [to the] statutory exhaustion requirements . . . ." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). So long as the State's administrative procedure grants "authority to take *some* action in response to a complaint," that procedure is considered "available," even if it cannot provide "the remedial action an inmate demands." *Id.* at 736 (emphasis added); *see also id.* at 739 ("Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible.").

By contrast, a remedy is not "available"—and exhaustion is not required—when:

> 1. The procedure "operates as a simple dead end" because "the relevant administrative procedure lacks authority to provide any relief," or "administrative officials have apparent authority, but decline ever to exercise it."

> 2. The "administrative scheme [is] so opaque that . . . no reasonable prisoner can use them."

> 3. Or when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross v. Blake*, 136 S. Ct. 1850, 1859–60 (2016) (quotation omitted).

Under these standards, Plaintiffs' suit appears premature. All parties agree that the TDCJ administrative process is open for Plaintiffs' use. And Plaintiffs do not argue that TDCJ is incapable of providing *some* (albeit inadequate) relief. Nor do they contend that TDCJ always "decline[s] to exercise" its authority, *id.* at 1859, that the scheme is unworkably opaque, or that administrators thwart use of the system, *see id.* at 1859–60. Therefore, according to the standards the Supreme Court has given us, TDCJ's grievance procedure is "available," and Plaintiffs were required to exhaust.

The district court disagreed. It considered the TDCJ process too lengthy to provide timely relief, and therefore incapable of use and unavailable under

the special circumstances of the COVID-19 crisis. *See* D. Ct. Op. at 16. Other inmates have tried this argument before. In *Blake v. Ross*, 787 F.3d 693 (4th Cir. 2015), the court of appeals held that true exhaustion was not required when the inmate had "exhausted his remedies *in a substantive* sense by affording corrections officials time and opportunity to address complaints internally." *Id.* at 698 (quoting *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007)).

The Supreme Court rejected this "special circumstances" exception "as inconsistent with the PLRA." *Ross*, 136 S. Ct. at 1855. In so holding, the Court noted that the precursor to today's § 1997e(a) "would require exhaustion only if a State provided 'plain, speedy, and effective' remedies . . . ." *Id.* at 1858 (quoting § 7(a), 94 Stat. 352 (1980)). By enacting the PLRA (which removed that proviso), Congress rejected this "weak exhaustion provision" in favor of an "invigorated" and absolute "exhaustion provision." *Ibid.* (quotation omitted). In the Supreme Court's view, reading a "special circumstances" exception into the PLRA would undo the PLRA and "resurrect" its predecessor. *Ibid.*

The district court's understanding of the exhaustion requirement similarly revivifies the rejected portions of the old regime. The crux of the court's concern is that TDCJ has not acted speedily enough. But that was an exception to exhaustion under the old § 1997e(a), not the current one. Moreover, the district court held that TDCJ's procedure would be unduly lengthy if TDCJ were to use the full time allotted for a response to the grievance under state law. *See* D. Ct. Op. at 17. But the district court never found that TDCJ *would* take the full time if given the chance. The holding that the TDCJ process "presents no 'possibility of some relief,'" *id.* at 17–18 (citing *Ross*, 136 S. Ct. at 1859), is therefore unsupported by the evidence.

Nor are we persuaded by the district court's reliance on *Fletcher v. Menard Correctional Center*, 623 F.3d 1171 (7th Cir. 2010). In that case, Judge

Posner hypothesized that administrative remedies might "offer no possible relief in time to prevent . . . imminent danger from becoming an actual harm." *Fletcher*, 623 F.3d at 1174. But, in that hypothetical, the State procedure could "offer no *possible* relief" because State law prohibited a response to the grievance until two weeks after it was filed—rendering the procedure of no use to an inmate threatened with death in 24 hours. *Ibid.* (emphasis added). In those circumstances, of course the procedure is unavailable—"it lacks authority to provide any relief," *Ross*, 136 S. Ct. at 1859, because as a matter of law it cannot respond quickly enough. We need not confront Judge Posner's hypothetical because TDCJ faces no legal bar to offering timely relief. TDCJ is empowered to act on a grievance any time *up to*—not *after*, as in *Fletcher*—the statutory limit. Relief by TDCJ therefore remains possible (and the procedure available), even if TDCJ has not acted as swiftly as Plaintiffs would like.[2]

B.

Finally, it appears that the district court's injunction goes well beyond the limits of what the PLRA would allow even if the Plaintiffs had properly exhausted their claims. The PLRA mandates that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). And the PLRA says courts "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary

---

[2] Nor is the possibility of TDCJ action speculative. As noted above in Part II.B, Defendants offered uncontroverted testimony from the Director of TDCJ Health Services that TDCJ adopted an infection control policy as early as March 20, 2020. Dkt. 36-7 at 3. TDCJ's medical directors have updated the policy periodically in response to ever-evolving CDC guidelines and other input. *Id.* at 4.

relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief." *Ibid.*

The district court's order recited these propositions, *see* PI Order at 1–2, but the injunction's substance contravenes them. This is a class-action injunction that applies to all inmates—disabled and non-disabled alike—in the Pack Unit. And it's hard to see how an injunction that prescribes both a prison-wide testing regime and a cleaning schedule down to the half-hour interval is "narrowly drawn" or the "least intrusive means" available. *See id.* at 3–4. So too with the requirement that every single sink have a sign over it with COVID-19 information. *See id.* at 3. These may be salutary health measures. But that level of micromanagement, enforced upon threat of contempt, does not reflect the principles of comity commanded by the PLRA.

\*     \*     \*

For the foregoing reasons, TDCJ's motion to stay the preliminary injunction pending appeal is GRANTED. The appeal is EXPEDITED to the next available argument calendar.

No. 20-20207

STEPHEN A. HIGGINSON, Circuit Judge, concurring in the judgment:

I agree that Appellants have demonstrated a substantial likelihood of success on their claim that Appellees failed to exhaust prison remedies prior to seeking relief in federal court. Appellees did not submit any grievance request to prison authorities before filing this lawsuit, and I am not aware of any case, nor do Appellees or the district court cite one, in which a prisoner has been deemed compliant with the Prison Litigation Reform Act (PLRA) when there has been no attempt to file a grievance prior to suit in federal court.[1]

I write separately, however, to emphasize two points as governments, state and federal, respond to the COVID-19 crisis, which presents enormous and imminent health risks for prisoners and correctional officers alike.

First, the instant stay order does not foreclose the possibility that, upon expedited consideration, our court may nonetheless conclude that a remedy using the Texas Department of Criminal Justice's (TDCJ) grievance system is not "available" because of the immediacy of the COVID-19 medical emergency coupled with statements credited by the district court that prisoners' grievances may not be addressed promptly. If these plaintiffs—geriatric prisoners, many of whom are medically compromised—have no opportunity to expedite systemic medical emergency grievances, our court might hold that prison administrative remedies "operate[] as a simple dead end" giving prison officials apparent authority though they decline to exercise it. *See Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016).[2]  However, here it is undisputed that the

---

[1] *Cf. United State of America v. Vigna*, No. S1 16-CR-786-3 (NSR), 2020 WL 1900495, at \*5 (S.D.N.Y. Apr. 17, 2020) (noting that the court is not aware of any case where an inmate's failure to exhaust has been excused without the inmate "at least submitting a request [to the prison] . . . prior to, or in conjunction with, his or her application to the court").

[2] *See also Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1174 (7th Cir. 2010); *Nellson v. Barnhart*, No. 20-CV-00756-PAB, 2020 WL 1890670, at \*4 (D. Colo. Apr. 16, 2020) (discussing importance of an imminent-danger exception while also noting that the Supreme Court clarified that "total and immediate relief is not the standard for exhaustion, 'the

plaintiffs sought relief in federal district court *prior* to filing *any* grievance, and Appellees cite no PLRA exhaustion caselaw supporting a not "available" determination ex ante.

Second, our reasoning on PLRA's exhaustion requirement does not foreclose federal prisoners from seeking relief under the First Step Act's provisions for compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Though that statute contains its own administrative exhaustion requirement, several courts have concluded that this requirement is not absolute and that it can be waived by the government or by the court, therefore justifying an exception in the unique circumstances of the COVID-19 pandemic. *See, e.g.*, *United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294, at *4–5 (S.D.N.Y. Apr. 14, 2020) (holding that, "[d]espite the mandatory nature of [the statute's] exhaustion requirement," the exhaustion bar is "not jurisdictional" and can therefore be waived); *United States v. Smith*, No. 12 Cr. 133 (JFK), 2020 WL 1849748, at *2–3 (S.D.N.Y. Apr. 13, 2020) (citing cases); *see also Vigna*, 2020 WL 1900495, at *5–6 (identifying the difficulties of the First Step Act exhaustion question while ultimately deferring a ruling until the petitioner exhausted his remedies); *but see United States v. Raia*, -- F.3d --, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020); *United States v. Clark*, No. 17-85-SDD-RLB, 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020).[3]

---

possibility of some relief' is"). *Cf. Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) (identifying the examples in *Ross* as "*at least* three" of the circumstances where the administrative process may be "unavailable" (emphasis added)); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016) ("We note that the three circumstances discussed in *Ross* do not appear to be exhaustive . . . .").

[3] I note that, unlike the PLRA, Section 3582 does not limit the exhaustion requirement to "available" remedies. *See* 18 U.S.C. § 3582(c)(1)(A) (authorizing a motion for a sentence reduction "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility"). The "availability" caveat—PLRA's "built-in exception to the exhaustion requirement," *Ross*, 136 S. Ct. at 1855— arguably presents a stronger basis from which to conclude that Appellants were not required to exhaust their remedies here.

Because Appellants are substantially likely to succeed on their argument that statutory exhaustion of administrative remedies was not even sought prior to filing this lawsuit, I would not reach the merits of Appellees' ADA and 42 U.S.C. § 1983 claims. Whereas those claims face high legal hurdles,[4] they also are intensely fact-based.[5] The district court assessed lay and expert testimony before making extensive and careful findings of fact showing that mitigation deficiencies still exist. D. Ct. Op. at 7–14. However, given the TDCJ's systemic and ongoing responses to fast-changing guidance, I would reserve for the merits panel the complex question of whether and which of these deficiencies amount to a cognizable violation.

---

[4] *See Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006) (holding that "deliberate indifference exists wholly independent of an optimal standard of care"); *see also Alexander v. Choate*, 469 U.S. 287, 301 (1985) (holding that an accommodation is reasonable under the ADA if it provides "meaningful access to the benefit[s] that the [prison] offers"); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996) (holding that in the prison context, it is appropriate to consider "[s]ecurity concerns, safety concerns, and administrative exigencies"); *cf. Garza v. City of Donna*, 922 F.3d 626, 636–37 (5th Cir. 2019) (holding that a deliberate indifference claim does not "require[] proof that officials *subjectively* intend that the harm occur" (emphasis added)).

[5] *See, e.g.*, *Banks v. Booth*, No. 1:20-cv-00849 (D.D.C. Apr. 19, 2020) (order granting temporary restraining order in COVID-19 prison context); *cf. Fraher v. Heyne*, No. 1:10-cv-00951-MJS (PC), 2011 WL 5240441, *2 (E.D. Cal. Oct. 31, 2011) (prisoner with preexisting heart condition who was refused a swine flu test could state a claim for violation of constitutional rights).