5/19/2020 9:42:51 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **19A1034.pdf** | versus | **19A1034_new.pdf** |
| **7 pages (72 KB)** | | **7 pages (71 KB)** |
| 5/14/2020 5:16:16 PM | | 5/19/2020 9:41:41 AM |

**Total Changes**

**6**

**Content**

5 Replacements

1 Insertion

0 Deletions

**Styling and Annotations**

0 Styling

0 Annotations

Go to First Change (page 1)

# SUPREME COURT OF THE UNITED STATES

LADDY CURTIS VALENTINE, ET AL. *v.* BRYAN
COLLIER, EXECUTIVE DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL
JUSTICE, ET AL.

ON APPLICATION TO VACATE STAY

No. 19A1034.  Decided May 14, 2020

The application to vacate stay presented to JUSTICE ALITO and by him referred to the Court is denied.

Statement of JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, respecting the denial of application to vacate stay.

In this lawsuit, inmates in a Texas geriatric prison allege that their facility failed to protect them from the dangers of Covid–19.  The District Court heard unrebutted testimony about the imminent dangers faced by the inmates, some of whom have already died.  It also heard testimony about the facility's lackluster efforts to keep the illness from spreading and held that the facility's inexplicable failures amounted to deliberate indifference for its elderly inmates in violation of the Eighth Amendment.  On that basis, it issued an injunction requiring the prison to follow an extensive protocol, including frequent cleaning and increased education efforts.  2020 WL 1899274 (SD Tex., Apr. 16, 2020). The Court of Appeals for the Fifth Circuit stayed that injunction pending appeal, and the inmates now seek to vacate that stay in this Court.  956 F. 3d 797 (2020) (*per curiam*).

Notably, where the Court is asked to undo a stay issued below, the bar is high.  Among other things, applicants must show that the lower court was "'demonstrably wrong in its application of accepted standards in deciding to issue the stay.'"  *Western Airlines, Inc.* v. *Teamster*s, 480 U. S.

1301, 1305 (1987) (O'Connor, J., in chambers). The Fifth Circuit ruled, among other things, that the prison was substantially likely to succeed on its claim that the inmates failed to exhaust their remedies as required by the Prison Litigation and Reform Act of 1995 (PLRA), 42 U. S. C. §1997e(a). Under the circumstances of this case, where the inmates filed a lawsuit before filing any grievance with the prison itself, it is hard to conclude that the Fifth Circuit was demonstrably wrong on this preliminary procedural holding.

I write separately to highlight the disturbing allegations presented below. Further, where plaintiffs demonstrate that a prison grievance system cannot or will not respond to an inmate's complaint, they could well satisfy an exception to the PLRA's exhaustion requirement. Finally, while States and prisons retain discretion in how they respond to health emergencies, federal courts do have an obligation to ensure that prisons are not deliberately indifferent in the face of danger and death.

I

The facility at issue (the Pack Unit) houses about 1,200 inmates, more than 800 of whom are 65 or older. As the District Court found, the risk of Covid–19 spreading in the Pack Unit is particularly high. The facility is a dormitory-style prison, with each inmate separated only by a short, cubicle-style half-wall. When the District Court issued its ruling, Covid–19 had already begun to spread in the facility. On April 11, 2020, one inmate, Leonard Clerkly, was transferred to the hospital because of difficulty breathing, a symptom the hospital linked to Covid–19. He was pronounced dead mere hours later.

Before and after Clerkly's death, prison administrators began implementing policies to control the spread of Covid–19. For instance, the prison placed all inmates on a precau-

tionary lockdown and began taking some inmates' temperatures twice a day. It also established a policy of providing inmates with cloth masks to be changed daily and instructed inmates to request additional soap at no cost. But the District Court found that the facility inexplicably failed to comply with some of its self-declared policies.

The District Court heard unrefuted testimony that, despite the prison's claim of enhanced cleaning measures, its cleaning protocol in practice remained virtually the same. The facility neither increased the number of inmate janitors nor ensured that the existing janitors did their jobs safely and effectively. One janitor testified that, just as before the pandemic, the cleaning solution provided to the cleaning crews was frequently depleted by midafternoon, only halfway through a shift. Each day he received only one pair of gloves to share with his co-janitor, an arrangement medical experts described as tantamount to no gloves at all. 2020 WL 1916883, *5–*6, *10 (SD Tex., Apr. 20, 2020).

The facility's failures to comply with its own safety protocol became even clearer after Clerkly's death. Prison policies required that any inmate showing signs of Covid–19 be "'triaged'" and "'placed in medical isolation'" and that all areas used by the symptomatic inmate be thoroughly disinfected. *Id.*, at *11. Yet even though Clerkly had difficulty breathing and died only a few hours after being transported to the hospital, the prison "made no representations" to the District Court that "they identified Mr. Clerkly as symptomatic, evaluated him for potential COVID-19 infection, or isolated or treated him for COVID-19 at any point before his transport to the hospital on the day of his death." *Ibid.* In fact, the prison "did not implement further precautionary measures until three days after Mr. Clerkly's death." *Ibid.* In the meantime, while the prison waited for a positive Covid–19 test that seemed certain to come, "countless inmates were knowingly exposed to a serious substantial risk of harm." *Ibid.*

## II

Having heard testimony from several witnesses from the Pack Unit and from prison experts who declared the Pack Unit practices "woefully inadequate," the District Court held that applicants were likely to succeed on their Eighth Amendment claim. *Id.,* at \*12. The court noted the "obvious" risk of Covid–19 to the older men in the Pack Unit and reasoned that the prison's failure to take basic steps, many of which were required by its own policies, evinced deliberate indifference. *Id.,* \*10, \*13. The District Court then ordered the prison to mitigate the harm to inmates, including through some measures recommended by an expert witness who had managed prisons himself. *Id.,* at \*6–\*7, \*9–\*12; 2020 WL 1899274.

Despite the District Court's detailed, careful findings, based on live testimony and the court's own visit to the Pack Unit, the Fifth Circuit stayed the injunction. The Fifth Circuit noted that the prison had submitted evidence of "the protective measures it ha[d] taken as a result" of the Covid–19 pandemic, and so the question was simply whether the Eighth Amendment required the prison "to do more." 956 F. 3d, at ___ – ___.[1] But in crediting the prison's assurances, the Fifth Circuit did not address all of the District Court's factual findings that the prison had inexplicably discarded its own rules and, in doing so, evinced deliberate indifference to the medical needs of its inmates.[2] See

———————

[1] One member of the Fifth Circuit panel concurred in judgment. See 956 F. 3d, at ___ (opinion of Higginson, J.). The concurrence reasoned that the inmates were unlikely to prevail on exhaustion, but noted that a merits panel could find on a full record that an exception to the PLRA's exhaustion requirement applied. The concurrence also argued that the motions panel should not have addressed the merits of the inmates' "intensely fact-based" claims in light of the District Court's "extensive and careful findings of fact that mitigation deficiencies still exist" in the prison. *Id.,* at ___.

[2] The Fifth Circuit also faulted the District Court for imposing standards higher than those recommended by the Centers for Disease Control

*Farmer* v. *Brennan*, 511 U. S. 825, 842 (1994) (noting that deliberate indifference is a question of fact often made out by "inference from circumstantial evidence"). The Fifth Circuit may have acted outside its authority in refusing to defer to those factual findings. See *Anderson* v. *Bessemer City*, 470 U. S. 564, 573 (1985). Similarly, while the Fifth Circuit faulted the District Court for issuing an admittedly exacting injunction, that injunction too was rooted in equally detailed factfinding regarding the prison's failure to live up to its promises.

Also concerning was some of the Fifth Circuit's language regarding exhaustion. This Court has made clear that the PLRA requires exhaustion only of "available" judicial remedies. *Ross* v. *Blake*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 8). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose.'" *Ibid.* (some internal quotation marks omitted). Thus, when a grievance procedure is a "dead end"—when "the facts on the ground" indicate that the grievance procedure provides no possibility of relief—the procedures may well be "unavailable." *Id.*, at \_\_\_ (slip op., at 9).

The Fifth Circuit seemed to reject the possibility that grievance procedures could ever be a "dead end" even if they could not provide relief before an inmate faced a serious risk of death. But if a plaintiff has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid–19,

––––––––––

and Prevention (CDC). But as the District Court noted, the CDC Guidelines themselves caution that they "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." 2020 WL 1916883, *12 (internal quotation marks omitted). Given the particular vulnerabilities of the inmates in the Pack Unit, even counsel for the prison admitted that steps beyond those prescribed by the CDC may be necessary. *Ibid.* And, of course, the District Court found that the prison was regularly failing to comply with standards far below what the CDC suggests. Much of its injunction targeted that behavior.

the procedures may be "unavailable" to meet the plaintiff's purposes, much in the way they would be if prison officials ignored the grievances entirely. *Ibid.* Here, of course, it is difficult to tell whether the prison's system fits in that narrow category, as applicants did not attempt to avail themselves of the grievance process before filing suit. But I caution that in these unprecedented circumstances, where an inmate faces an imminent risk of harm that the grievance process cannot or does not answer, the PLRA's textual exception could open the courthouse doors where they would otherwise stay closed.

## III

While I disagree with much of the Fifth Circuit's analysis at this preliminary juncture, the court required reports every 10 days on the status of the inmates in the prison's care. I expect that it and other courts will be vigilant in protecting the constitutional rights of those like applicants. As the circumstances of this case make clear, the stakes could not be higher. Just a few nights ago, respondents revealed that "numerous inmates and staff members" at the Pack Unit "are now COVID-19 positive and the vast majority of those tested positive within the past two weeks." Supp. Brief Regarding Emergency Application 1.

Nothing in this Court's order, of course, prevents the Fifth Circuit from amending its stay. Nor does anything in our order prevent applicants from seeking new relief in the District Court, as appropriate, based on changed circumstances. Finally, administrative convenience must be balanced against the risk of danger presented by emergency situations. The prison, for example, has failed to explain why it could not simply decrease dorm density, despite having an empty unit at its disposal.

It has long been said that a society's worth can be judged by taking stock of its prisons. That is all the truer in this pandemic, where inmates everywhere have been rendered

vulnerable and often powerless to protect themselves from harm. May we hope that our country's facilities serve as models rather than cautionary tales.