**Reversed and Rendered and Opinion Filed May 19, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-20-00579-CV

## DALLAS COUNTY SHERIFF MARIAN BROWN, IN HER OFFICIAL CAPACITY, Appellant
## V.
## DAVID DANIELS, JODIE CAMPBELL, AND KELLIE MCCULLAR, ON BEHALF OF THEMSELVES AND A CLASS OF MEDICALLY VULNERABLE PERSONS, Appellees

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-20-07112**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Myers, and Justice Carlyle
Opinion by Justice Myers

This is an accelerated, interlocutory appeal from the trial court's order denying the plea in abatement filed by appellant Dallas County Sheriff Marian Brown. Appellees David Daniels, Jodie Campbell, and Kellie McCullar, on behalf of themselves and a class of 1,800 "medically-vulnerable" persons detained in the Dallas County Jail, sued Sheriff Brown in her official capacity. Sheriff Brown brings three issues arguing the trial court erred in denying the plea in abatement. We sustain the Sheriff's issues, reverse the trial court's order, and render judgment

1

dismissing appellees' claims for lack of subject matter jurisdiction.

## BACKGROUND AND PROCEDURAL HISTORY

## I. Introduction:  The Lawsuit

This lawsuit brought by appellees concerns conditions at the Dallas County Jail (Jail) during the COVID-19 pandemic.  On May 21, 2020, appellees filed their original verified petition against Dallas County Sheriff Marian Brown (Sheriff) in her official capacity.  Appellees sought injunctive relief under Texas constitutional, statutory, and common law on behalf of themselves and a class of approximately 1,800 "medically-vulnerable" people detained in the Jail.  Appellees explained the "Necessity of Action" in what they characterized as "simple and obvious" terms on the first page of their original verified petition:

- • COVID-19 poses a serious threat to health and life;

- • The threat is especially elevated for people who are medically vulnerable;

- • The medical consensus suggests that six feet of social distancing is necessary to prevent the spread of COVID-19; and

- • Social distancing is not possible at the jail complex under current conditions.

Appellees' petition stated in part:

> Unlike members of the general public, Class members are unable to socially distance and avoid close contact with detained individuals and DSOs [Detention Service Officers] who are spreading COVID-19 within the Jail, and Class members are also unable to take other steps to protect themselves from injury and death and are utterly dependent on the Sheriff for protection of their health and lives.  The Sheriff's failure to provide adequate PPE [personal protective equipment],

cleaning, training, and other measures to prevent unnecessary spread of COVID-19 makes the lack of social distancing even more dangerous to Plaintiffs and the members of the Class.

The petition cited a study by UT Southwestern Medical Center projecting that, in Dallas County, "a 5-percentage-point gain in the effectiveness of social distancing from 60 percent to 65 percent would prevent 800 new COVID-19 cases a day by the middle of July 2020."

Appellees' original petition alleged the following claims:

• Count I:  Violation of Article 1, sections 13 and 19 of the Texas Constitution

• Count II:  Public Health Nuisance

• Count III:  Negligence and Gross Negligence.

Appellees asserted that "the Sheriff's conduct violates the rights of Plaintiffs and members of the Class under the Bill of Rights in the Texas Constitution as well as under Texas statutory and common law," and they sought "emergency injunctive relief to stop the unsafe and unconstitutional conditions causing immediate and irreparable harm and the imminent loss of human life and serious damage to human health." They alleged "the Sheriff's actions and inactions violated Article I, Sections 13 and 19, of the Texas Constitution, violate the Sheriff's mandatory obligations under Texas statutory law, and would, unless restrained, cause personal injury and death in contravention of Texas tort law."

## II. The Plea to the Jurisdiction

The Sheriff filed a plea to the jurisdiction.  The plea, filed on May 22, 2020,

challenged the allegations in appellees' petition, claiming appellees failed to plead sufficient facts to avoid immunity. Sheriff Brown contended the court lacked subject matter jurisdiction because:

- There is no private cause of action for equitable relief under the Texas Constitution;

- Appellees have not identified a statutory basis for injunctive relief;

- Appellees have not pled a use or condition of property sufficient to waive immunity under the Texas Tort Claims Act (TTCA);

- Plaintiffs have not identified any ministerial duty imposed on Sheriff Brown sufficient to support an ultra vires claim.

The Sheriff argued that her response to the challenges posed by a public health emergency involved the exercise of discretion and judgment, triggering the doctrine of sovereign immunity.

The trial court heard Sheriff Brown's plea in a hearing held on May 26, 2020, but deferred ruling because technical problems prevented receipt of some submissions. In an email to counsel sent two days later, on May 28, the trial court informed the parties it was denying the plea: "I hereby deny Defendant's Plea to the Jurisdiction. [Appellees' counsel], please circulate an order and efile it. In light of this ruling, you are ordered to confer on expedited discovery, if needed." Appellees' counsel sent a proposed order denying the plea to the Sheriff's counsel, who approved it as to form. The proposed order, however, was not tendered to the court.

### III. The Sheriff Files a Notice of Appeal

On June 01, 2020, the appellees filed their first amended verified petition, and

two days later, on June 3, Sheriff Brown filed a notice of interlocutory appeal from the trial court's order denying her plea to the jurisdiction. Arguing no written order had been signed, appellees moved to dismiss the appeal. On June 12 we issued an order deferring ruling on the motion and ordering responses from the parties. On June 16, 2020, the trial court signed an order deferring a ruling on the plea to the jurisdiction, concluding it should make the jurisdictional determination:

> [A]fter a fuller development of the case through expedited discovery requested by Plaintiffs, evidence presented at a hearing to be conducted on the Plea and Plaintiffs' application for temporary injunction, and further briefing by the parties of the issues raised by the Plea and any amendment to it in light of the evidence.

Six days later, on June 22, 2020, appellees filed their second amended verified petition.

### IV. The Sheriff Seeks Mandamus Relief

Meanwhile, on June 25, 2020, Sheriff Brown sought mandamus relief in this Court, arguing the trial court's June 16 order deferring its ruling on her plea deprived her of her right to an accelerated, interlocutory appeal. On July 20, 2020 we conditionally granted the writ, concluding the trial court abused its discretion in deferring its ruling on the plea and ordering the trial court to (1) vacate its June 16 order and (2) rule on the plea. *See In re Brown*, No. 05-20-00639-CV, 2020 WL 4047965 (Tex. App.—Dallas July 20, 2020, orig. proceeding). On July 21, the trial court signed a written order vacating the June 16 order and denying Sheriff Brown's plea after "having considered the Plea and the Parties' submissions and arguments

–5–

of counsel." Eight days later, on July 29, 2020, we denied appellees' motion to dismiss the appeal.

## V. *Sanchez v. Brown*

Appellees' original verified and first amended verified petitions both exceed 1,000 pages in length because—in addition to affidavits and declarations from witnesses who expressed opinions about COVID-19 and its spread or provided information about conditions at the Jail—they attach and incorporate by reference the entire 1,091-page reporter's record from a four-day preliminary injunction hearing held in a related (and, at the time of this opinion, ongoing) federal lawsuit.[1] That lawsuit was brought by Jail inmates against Sheriff Brown and Dallas County,[2] and likewise complained of conditions at the Jail arising from COVID-19. *See Sanchez v. Brown*, No. 3:20-cv-00832-E, 2020 WL 2615931 (N.D. Tex. May 22, 2020) (mem. op. and order) (denying request for a preliminary injunction).

At the time the trial court held the hearing on the plea to the jurisdiction, appellees' original petition was the "live" pleading. Later, after the Sheriff filed the instant notice of appeal (and three days before she sought mandamus relief in this Court from the trial court's June 16, 2020 order deferring its ruling on the plea to the jurisdiction), appellees filed their second amended verified petition, which is now

---

[1] The accompanying verification by counsel stated that the attached reporter's record was a true and correct copy of the official transcription of the federal hearing.

[2] The State of Texas; the Honorable Greg Abbott, Governor of Texas; and the Honorable Ken Paxton, Attorney General of Texas, moved to intervene in the federal case as defendants.

their live pleading. The second amended petition includes, according to counsel's verification, excerpts of the testimony heard in federal court.[3]

## VI. The Second Amended Verified Petition

Appellees' second amended petition adds (among other things) updated information about the spread of COVID-19 in the community and in the Jail as well as other factual information,[4] cites a May 22, 2020 executive order from the Governor of Texas,[5] and also cites additional statutory and regulatory provisions.

The lack of social distancing at the Jail is at the heart of appellees' complaint. Appellees cite the Center for Disease Control's (CDC's) recommendation of social distancing to prevent the spread of COVID-19. Appellees allege in their petition:

18. On March 23, 2020, the Centers for Disease Control and Prevention (CDC) issued its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Interim Guidance"). The CDC Interim Guidance recommended "social distancing" as a "cornerstone" of any strategy to prevent the

---

[3] These excerpts do not include: cross-examinations by the defense and the intervenors of most of the plaintiffs' witnesses, including chief deputy of the Jail Frederick Robinson, who is in charge of Jail operations; the defense's direct examination of Patrick Jones, the vice president of correctional health services at Parkland Hospital, who oversees inmate health services; and the parties' closing arguments. Altogether, approximately 540 pages from the reporter's record are not included.

[4] The second amended petition references to revised data from the study by infectious disease experts at UT Southwestern Medical Center cited in the original petition. According to the petition, the study showed "a 4-percentage-point gain in the effectiveness of social distancing from 61 percent to 65 percent would prevent approximately 700 new COVID-19 cases a day by the first of August 2020 and an exponentially larger number of new cases after early August 2020." The petition adds that "[t]he study also shows that increasing the effectiveness of social distancing and other measures to 68 percent would reduce new cases to 200 a day by July 2020 and to near zero by November 2020."

[5] The Governor's May 22, 2020 executive order declared that "the jail population in Texas presents unique challenges in mitigating against and responding to the spread of COVID-19." *See* Governor of the State of Texas, Executive Order GA 25, at 1 (May 22, 2020), available at https: //gov.texas.gov/uploads/files/press/EO-GA-25_in-person_visitation_for_jails_COVID-19.pdf ("Relating to in-person visitation at county and municipal jails during the COVID-19 disaster") (last visited May 18, 2021).

spread of COVID-19 in a jail setting.

* * * *

34. Jails must maintain or create environments that allow social distancing because it is the only way to prevent people from contracting COVID-19.

Appellees fault Sheriff Brown for not promptly adopting and implementing the CDC's interim guidance after the discovery of an active COVID-19 case in the Jail; for not providing the CDC's guidance to DSOs or to Jail staff; and for not providing them with training about COVID-19. Appellees allege it is impossible to adequately socially distance under the current living and population density conditions at the Jail, and that following the CDC's social distancing guidelines requires allowing enough space to permit detained persons, DSOs, and other staff and visitors "to keep at least 6 feet apart." Appellees claim the Jail population needs to be reduced so that people detained there can eat, sleep, and live at least six feet apart. Appellees allege that to enforce social distancing, Sheriff Brown ought to use, and is not using, over 2700 "Available Beds" in the Jail to reduce population density and practice social distancing:

30. As of June 1, 2020, 5,096 people were detained in the Jail, up more than 300 from the average of 4,714 during May 2019, with 2,775 "Available Beds" that could be used to decrease density within the Jail.

Appellees allege the Jail is not making sufficient efforts to protect medically vulnerable persons from infection because it is not practicing social distancing for those inmates and, as a practical matter, cannot do so because of its unwillingness to

–8–

adequately staff the Jail and use available pods, tanks, and cells. Appellees further allege that, contrary to Texas law, the Sheriff does not provide adequate numbers of DSOs, supervisors, and staff to properly observe and protect inmates, including those who are medically vulnerable, from exposure to COVID-19. Appellees also point to the stated belief of Parkland Hospital's Vice President of Correctional Health Services, Patrick Jones, that reducing population density in the Jail is a "feasible" response to the danger of COVID-19 infection at the Jail.

Citing the CDC's interim guidance, appellees call for up-to-date information about COVID-19 to be provided to DSOs and inmates on a regular basis, and they complain about the alleged lack of training for DSOs and inmates at the Jail regarding COVID-19 and social distancing. Appellees claim that Parkland, which administers inmate health care, has never provided training for social distancing or other matters addressed by the CDC's guidance to DSOs or inmates in the Jail, apart from a videotape on putting on and removing PPE.

Appellees also allege the Sheriff is understaffing the Jail because too many inmates are housed together in multi-occupancy tanks and pods. Appellees fault the Sheriff for not having enough single or smaller cells that could be used "to house just one person or even a few," and allege that if the Jail had enough single or smaller cells it would not have to house potentially exposed people with others who have not yet been exposed to COVID-19. Appellees allege the CDC's guidance on intensifying cleaning and disinfecting procedures is not followed, including wiping

–9–

down commonly touched surfaces several times per day. Alcohol wipes or other disinfectant wipes are not provided to inmates, nor is CDC-recommended bleach-based cleanser provided to inmates. Also, the Jail is being cleaned by the inmates themselves, not professional cleaning crews trained on proper cleaning techniques. Appellees further allege that "[c]ommon surfaces where droplets of the coronavirus may accumulate are not cleaned," "[n]or are the electronic kiosks and pay phones for people detained in the Jail to use for communications cleaned or disinfected."

Other theories appellees allege concern "[e]ffective PPE" such as N-95 masks not being available for inmates or most of the Jail staff, and no training on the proper use of available PPE; inmates sitting within six feet of each other during mealtimes (which last about thirty minutes) and not wearing masks; and the failure to conduct adequate COVID-19 testing in the Jail. More specifically, appellees allege that inmates who have COVID-19 and are "shedding" the virus but asymptomatic "are very unlikely to be tested in the Jail," and people entering and leaving the Jail—lawyers, loved ones of inmates, Jail staff, or medical staff from Parkland—are not tested for COVID-19. Appellees allege the only people tested for COVID-19 are symptomatic inmates and people who "for some reason or another come to the attention of Parkland," or those "Parkland chooses to test." Another allegation made by appellees is that inmates share sinks, with one sink in each pod; they have only bars of soap available; and they cannot obtain liquid soap.

The petition quotes from a letter written by Dr. Ank Nijhawan, who worked

at the Jail as the lead infectious disease physician, to the Sheriff and other Dallas County officials urging them to consider releasing certain Jail inmates.  As quoted in appellees' complaint, her letter reads as follows:

> As an infectious diseases doctor, I strongly urge you to consider *releasing defendants* in the Dallas County Jail who are charged with non-violent offenses.  For the reasons below, it is important to prioritize inmates who are older (over 50 years of age) or have pre-existing conditions such as cancer, diabetes, lung disease (such as asthma or chronic obstructive pulmonary disease), heart disease, or HIV.
>
> The Dallas County Jail and other large correctional facilities *pose a real and immediate danger to the health of the community*.  An even limited outbreak of COVID-19 in the Dallas County Jail has *the potential to overwhelm our already overburdened hospital system and will directly impact security staff and healthcare staff at the jail*.  As we have already had *one incarcerated individual test positive for COVID-19*, and *this epidemic can spread quickly* both within the jail and to vulnerable people in our community.
>
> According to the Centers for Disease Control and Prevention, older adults and people with serious chronic medical conditions like heart disease, diabetes, and lung disease are at higher risk of becoming ill from COVID-19. On average, the people housed in our correctional facilities are older and more likely to suffer from poor physical health and illness as compared with the general public, which means they are exactly the type of high-risk group that will fall very sick if they come into contact with COVID-19.  Of the 5000+ persons incarcerated at the Dallas County Jail, over half have chronic medical conditions.
>
> To make matters worse, *social distancing is nearly impossible in a jail setting*, where people are housed in a relatively small spaces with up to 60 people at a time.  In addition[,] *200-300 inmates enter and leave the Dallas County Jail on a daily basis*, severely limiting the ability to meaningfully quarantine individuals who have been exposed or who are at high risk for developing the disease.
>
> If we do not reduce the population in the Dallas County Jail substantially, and in very short order, we risk *contributing to an already expanding outbreak, compromising the health of vulnerable*

–11–

*incarcerated individuals, jail healthcare providers and security staff as well as jeopardizing the health of the Dallas community at large.*

The second amended petition continues to allege three causes of action: (1) violation of Article I, sections 13 and 19 of the Texas Constitution; (2) public health nuisance; (3) negligence, gross negligence, and negligence and gross negligence per se. Appellees also allege, as in their original petition, three bases for a waiver of or an exception to sovereign immunity: (1) their claims under the Texas Constitution; (2) Sheriff Brown's alleged ultra vires acts; and (3) the TTCA.

Regarding the Texas Constitution, appellees allege that "[t]he State of Texas has no power or legal authority to commit acts contrary to the guarantees in the Texas Bill of Rights," and that "[s]overeign immunity thus does not prohibit a suit— like this one—for equitable relief under the Texas Constitution."

Next, appellees allege immunity does not "protect a county official's actions without legal authority" that violate "Texas statutory law or a county official's failure to perform a ministerial act that Texas statutory law mandates." To support their ultra vires claims, appellees point to various statutory and regulatory provisions. As in their original petition, they cite section 351.010(4) of the Texas Local Government Code and sections 341.011 and 341.012 of the Health and Safety Code, claiming the Sheriff's actions and inactions are responsible for an ongoing "public health nuisance" at the Jail. The second amended petition also includes alleged violations by the Sheriff of the Texas Administrative Code (TAC). *See* 37 TEX. ADMIN. CODE §§ 273.3, 275.1, 275.4, 279.3. Appellees claim that because they

–12–

"seek to enjoin the Sheriff to cease acting without legal authority . . . contrary to these Code provisions and to perform her mandatory, ministerial duties under these statutory provisions, sovereign immunity does not apply to Plaintiffs' claims."

As for the TTCA, appellees allege it provides a further basis for a waiver of immunity because "a condition or use of tangible personal or real property" by the Sheriff threatens to cause them personal injury and death:

> The condition of pods, tanks, and other common areas in the Jail, and of tangible personal property in the pods, tanks, and other common areas, poses an inherent danger and hazard in the intended and ordinary use of the property due to the presence and concentration of disease-causing elements of the novel coronavirus and COVID-19 in or on the tangible personal and real property and due to the Sheriff's employment of tangible personal and real property in ways that expose detainees to such disease-causing elements. Employing the pods, tanks, other common areas, and tangible personal property to confine and provide mandatory support for crowds of medically-vulnerable people who cannot protect themselves through social distancing and other measures and thus exposing them to high risk of infection is an inherently unsafe use of real property and tangible personal property in the Jail by the Sheriff (footnotes omitted).

Appellees' second amended petition seeks "all appropriate injunctive relief," including "that the Sheriff must immediately begin and continue to enforce effective social distancing" for class members at the Jail "by reducing crowding in pods, tanks, and other shared spaces such that it is practicable for Class members to remain at least 6 feet away from other persons at all times and provide adequate staffing at the Jail."

## DISCUSSION

### I. Issues Raised

Sheriff Brown brings the following three issues, arguing the trial court erred in denying the Sheriff's plea to the jurisdiction:

1. Sheriff Brown is immune from suit for her decisions and actions arising from the operations of the Dallas County Jail and her management of the COVID-19 crisis.

2. Sheriff Brown is immune from suit based on Plaintiffs' claims that she denied their rights under provisions of the Texas Constitution guaranteeing them due course of law and protection from cruel and unusual punishment.

3. Sheriff Brown is immune from suit based on Plaintiffs' claims under the TTCA.

### II. Standard of Review

It is the plaintiff's burden to allege facts affirmatively establishing the trial court's subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd*, 852 S.W.2d 440, 446 (Tex. 1993). A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Subject matter jurisdiction—essential to the authority of the court to decide a case—is never presumed and cannot be waived. *Tex. Ass'n of Bus.*, 852 S.W.2d at 443–44.

When, as in this case, a plea to the jurisdiction challenges the pleadings, we determine if the pleader alleges facts affirmatively demonstrating the trial court's jurisdiction to hear the case. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d

–14–

217, 226 (Tex. 2004) (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 446). We construe the pleadings liberally in favor of the plaintiff and look to the pleaders' intent. *Id*. at 226. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded an opportunity to amend. *Id*. at 226–27. If, however, the pleadings affirmatively negate the existence of jurisdiction, the plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id*. at 227.

"While we must construe the allegations in favor of the plaintiff, we are not bound by legal conclusions." *City of Pasadena v. Kuhn*, 260 S.W.3d 93, 95 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Questions regarding whether the plaintiff has alleged facts affirmatively demonstrating a trial court's subject matter jurisdiction and whether undisputed evidence of jurisdictional facts establishes a trial court's lack of jurisdiction are both questions of law we review de novo. *Miranda*, 133 S.W.3d at 226. Because subject matter jurisdiction is a question of law, we review a trial court's ruling on a plea to the jurisdiction de novo. *Id*.

Sovereign immunity from suit will defeat a trial court's subject matter jurisdiction unless the State expressly consents to suit. *Sykes*, 136 S.W.3d at 638. Governmental immunity operates like sovereign immunity and affords similar protection to subdivisions of the State, including counties and cities. *Id*. The TTCA provides a limited waiver of governmental immunity if certain conditions are

–15–

satisfied. *Id.*

Governmental immunity from suit defeats a trial court's subject matter jurisdiction; thus, it is properly asserted in a plea to the jurisdiction. *Miranda*, 133 S.W.3d at 225–26; *Dallas Cty. v. Garcia*, No. 05-18-01038-CV, 2019 WL 3491932, at *2 (Tex. App.—Dallas Aug. 1, 2019, no pet.) (mem. op.). Public officials sued in their official capacities, like Sheriff Brown in the instant case, are protected by the same governmental immunity as the governmental units they represent. *See, e.g., Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 843–44 (Tex. 2007); *Morris v. Copeland*, 944 S.W.2d 696, 698–99 (Tex. App.—Corpus Christi 1997, no pet.). However, a narrow exception to this rule exists for ultra vires claims; even if immunity has not been waived by the Legislature, a claim may be brought against a governmental official if the official engages in ultra vires conduct. *City of Houston v. Houston Mun. Employees' Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018); *see also Dunson v. Jacobson*, No. 02-18-00059-CV, 2019 WL 4122606, at *4 (Tex. App.—Fort Worth Aug. 29, 2019, no pet.) (mem. op.). Ultra vires suits do not implicate immunity because they do not attempt to exert control over the state—they attempt to reassert the control of the state over one of its agents. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

To fall within the ultra vires exception, a suit must not complain of a government official's exercise of discretion but must allege, and ultimately prove, the official (1) "acted without legal authority" or (2) "failed to perform a purely

ministerial act." *Houston Mun. Employees' Pension Sys*., 549 S.W.3d at 576; *Heinrich*, 284 S.W.3d at 372; *see also Hall v. McRaven*, 508 S.W.3d 232, 241 (Tex. 2017). An official acts without legal authority if she exceeds the bounds of her authority or if her acts conflict with the law itself. *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). "'Ministerial acts' are those 'where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.'" *Houston Mun. Employees' Pension Sys*., 549 S.W.3d at 576 (quoting *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994))). "Conversely, 'discretionary acts' are those that 'require the exercise of judgment and personal deliberation.'" *Id*. (quoting *Emmett*, 459 S.W.3d at 587).

"'Ultra vires claims depend on the scope of the state official's authority,' not the quality of the official's decisions." *Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 68 (Tex. 2018) (quoting *Hall*, 508 S.W.3d at 234). "Thus, it is not an ultra vires act for an official to make an erroneous decision within the authority granted." *Id*.

"We look to applicable rules, ordinances, and statutes to determine whether an alleged act or failure to act fits within the narrow ultra vires exception." *Edinburg Consol. Indep. Sch. Dist. v. Smith*, No. 13-16-00253-CV, 2016 WL 3068119, at *13 (Tex. App.—Corpus Christi [Edinburg] May 26, 2016, no pet.) (mem. op.); *see also*

–17–

*Houston Belt & Terminal Ry. Co.*, 487 S.W.3d at 164; *Tex. Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 701–02 (Tex. App.—Austin 2011, no pet.); *Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 516 n.8 (Tex. App.—Austin 2010, no pet.). "[M]erely asserting legal conclusions or labeling a defendant's actions as 'ultra vires,' 'illegal,' or 'unconstitutional' does not suffice to plead an ultra vires claim—what matters is whether the facts alleged constitute actions beyond the governmental actor's statutory authority, properly construed." *Tex. Dept. of Transp.*, 357 S.W.3d at 701–02 (citing *Creedmoor–Maha Water Supply Corp.*, 307 S.W.3d at 515–16 & n.8). "To this extent, the jurisdictional inquiry with respect to appellees' purported ultra vires claims would substantially overlap with the claims' merits." *Id.* (citing *Creedmoor–Maha Water Supply Corp.*, 307 S.W.3d at 516 n.8).

### III.  Issue Two:  Claims Under the Texas Constitution

### A. Article I, Sections 13 and 19

We begin with the Sheriff's second issue, which argues she is immune from suit for appellees' claims under the Texas Constitution.  These claims are based on the Article I, section 13 prohibition on "cruel or unusual punishment," and the Article I, section 19 "due course of law" guarantee.  *See* TEX. CONST. art. I, § 13 ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted."); § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised,

–18–

except by the due course of the law of the land."). Appellees argue Texas law confers no immunity on the Sheriff for violating the Texas Bill of Rights.

Article I, section 13 carves out the same liberty interest protected by the Eighth Amendment of the U.S. Constitution. *See, e.g., Ajisebutu v. State*, 236 S.W.3d 309, 311 n.2 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Jackson v. State*, 989 S.W.2d 842, 845–46 (Tex. App.—Texarkana 1999, no pet.); *Puga v. State*, 916 S.W.2d 547, 550 (Tex. App.—San Antonio 1996, no pet.); *see also Pratt v. State*, No. 05-05-00688-CR, 2007 WL 10554, at *7 n.4 (Tex. App.—Dallas Jan. 3, 2007, no pet.) (not designated for publication). Likewise, article I, section 19, the due course of law provision, is generally construed in the same way as the Fourteenth Amendment. *See Texas Workers' Comp. Comm'n v. Patient Advocs. of Texas*, 136 S.W.3d 643, 658 (Tex. 2004) (although Article I, Section 19 and the Fourteenth Amendment are textually different, "we generally construe the due course clause in the same way as its federal counterpart") (citing *Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)); *In the Interest of J.W.T.*, 872 S.W.2d 189, 207–08 (Tex. 1994).

## B. Appellees Must Plead a Viable Constitutional Claim

The Texas Constitution's Bill of Rights does not provide a private right of action for damages for violations of constitutional rights, but suits for equitable or injunctive relief may in some instances be brought to remedy violations of the Texas Constitution. *See City of Elsa v. M.A.L.*, 226 S.W.3d 390, 391(Tex. 2007); *City of*

*Beaumont v. Bouillion*, 896 S.W.2d 143, 148–49 (Tex. 1995); *City of Houston v. Downstream Envtl., L.L.C.*, 444 S.W.3d 24, 38 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Even so, however, "this limited waiver of immunity exists only to the extent the plaintiff has pleaded a viable constitutional claim." *Downstream Envtl.*, 444 S.W.3d at 38; *City of Houston v. Johnson*, 353 S.W.3d 499, 504 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). The fact that a plaintiff alleges unconstitutional conduct by an official does not alone mean it has avoided immunity and invoked a trial court's jurisdiction. *Creedmoor–Maha Water Supply Corp.*, 307 S.W.3d at 515. A plaintiff must still plead a valid constitutional violation. *See Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 77 (Tex. 2015) (stating "principle that claims against state officials—like all claims—must be properly pleaded in order to be maintained"); *Klumb v. Houston Mun. Emples. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015) ("While it is true that sovereign immunity does not bar a suit to vindicate constitutional rights, immunity from suit is not waived if the constitutional claims are facially invalid.") (citations omitted); *see also Creedmoor– Maha Water Supply Corp.*, 307 S.W.3d at 516; *Chisholm Trail SUD Stakeholders Grp. v. Chisholm Trail Special Util. Dist.*, No. 03-16-00214-CV, 2017 WL 2062258, at *6 (Tex. App.—Austin May 11, 2017, pet. denied) (mem. op.).[6] We now turn to

---

[6] The Sheriff also argues that appellees must show a breach of a ministerial duty in connection with their claims under the Texas Constitution, and that they did not allege a proper basis for liability here because the due course of law and cruel and unusual punishment provisions in the Texas Constitution are not self-executing, nor do they impose ministerial duties. We need not resolve this dispute because, as

–20–

that question.

## C. Due Process Clause and Deliberate Indifference

Pretrial detainees' rights exist under the Due Process Clause of the Fourteenth Amendment but are subject to the same scrutiny as if they had been brought as a "deliberate indifference" claim under the Eighth Amendment. *See Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (citing *Hare v. City of Corinth*, 74 F.3d 633, 648–49 (5th Cir. 1996) (en banc)); *see also Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019) ("Our court has based its Fourteenth Amendment case law concerning pretrial detainees on the [United States] Supreme Court's Eighth Amendment precedent concerning prisoners."). The Eighth Amendment imposes duties on prison officials, who must provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must ensure "inmates receive adequate food, clothing, shelter, and medical care," and must take reasonable measures to guarantee the safety of the inmates. *Id*.; *see also Cleveland*, 938 F.3d at 676 (Eighth Amendment prohibits "deliberate indifference" to prisoner's medical needs) (citing *Farmer*, 511 U.S. at 834–47). Prison officials who act reasonably cannot be found liable under the Eighth Amendment. *Farmer*, 511 U.S. at 845.

"The 'incidence of diseases or infections, standing alone,' do not 'imply unconstitutional confinement conditions, since any densely populated residence may

discussed in this opinion, even if we assume appellees can bring an action like this against the Sheriff for injunctive relief under the Texas Constitution, their constitutional claims are facially invalid and, thus, fail as a matter of law.

–21–

be subject to outbreaks.'" *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (quoting *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009)). "Instead, the plaintiff must show a denial of 'basic human needs.'" *Id*. (quoting *Shepherd*, 591 F.3d at 454). "'Deliberate indifference is an extremely high standard to meet.'" *Id*. (quoting *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020)).

### D. Testimony Incorporated into the Second Amended Petition

We noted before that appellees' live pleading incorporates by reference excerpts of testimony heard in federal court in the *Sanchez v. Brown* litigation. That testimony shows the Jail has taken some steps to mitigate the spread of COVID-19 at the Jail. During his testimony, for example, Jail DSO Emanuel Lewis, assigned to the South Tower, testified that inmates at the Jail occupy bunk beds in tanks or pods that hold up to 64 inmates. Some of these pods are full; others are not. Lewis spoke of pods that had been closed because of a COVID-19 exposure. As for the pods that were open, he testified that before a shift change, sometimes after dinner, and near the end of his shift, inmates were given access to mops and cleaning products to clean their living areas. Replacement mop heads could be brought in when mops needed to be "change[d] . . . out." Lewis did not know the names of the cleaning products they used, but he talked about a "yellow liquid" that was "like" a disinfectant, and a "pink liquid" that was "like" a detergent. The cleaning at the Jail was done by the inmates themselves, not professional cleaning crews. Lewis said bleach was "not always available," but when available, it was stored at the desk

–22–

where the DSO sat and provided to inmates upon request. He also testified, however, that "recently" the Jail had "a lot of bleach available."

Although Lewis stated that inmates cleaned their own living areas, he testified that professional cleaning services were sometimes used at the Jail, but he did not know the specific cleaning procedures that were used. He said he had seen cleaning services that were not as thorough as the inmates. He described these services as being "there for like, two minutes, spraying a little bit around," and then leaving.

Lewis said that since the Jail was closed for in-person visits with inmates, other than for the attorneys representing them, inmates had access to kiosks where they could sit and talk with people outside the Jail for free by video conference. He also described how lawyers have "been doing a lot of the video visits," calling in and doing "a video visit to meet with the inmate." Lewis said he had not seen commonly touched surfaces such as tables or the receivers of pay phones wiped down on a regular basis.

According to Lewis, the Jail had recently started checking employees' temperatures before they begin their shifts, but he did not have access to a thermometer in the pod where he worked. He also said that, recently, after the federal lawsuit was filed, "we got a huge thing" of disinfectant wipes to use in the pods. In addition, they now had a "big bottle" of hand sanitizer for Jail staff to use (he said it smelled like "hundred percent rubbing alcohol"), and inmates could now come up to the desk and ask a DSO to spray their hands with hand sanitizer. Lewis

said inmates had hand towels and had access to a roll of brown paper towels. Lewis testified that DSOs had liquid soap. Inmates had no liquid soap but were given "thin bars of soap" and would be given additional soap if they asked a DSO. Lewis said that inmates were washing their hands "a lot more recently." He also testified that, recently, the Jail had begun using disposable trays to feed inmates. Inmates still lined up for eating. Lewis said they were typically "all close in" when they were in line to be served "because it's a small area." In Lewis's opinion, "The way it is set up in the South Tower pods, it is impossible to have social distancing."

As for PPE, Lewis testified that he had recently been provided, at no cost to him, with PPE such as face masks and gloves, and they were replaced as needed. He was not given any written instructions on how to deal with COVID-19 issues or how to detect COVID-19 exposure or symptoms. He testified he had only "[r]ecently," i.e., "around the time of the lawsuit,"[7] started wearing a mask when doing his rounds. Lewis did not have an N-95 mask. He testified that he had "seen a few" such masks at the Jail but not many, and that was after the federal lawsuit was filed.

Lewis testified that inmates who performed janitorial work at the Jail received both gloves and masks to use while they did their cleaning work; and all inmates now had face masks, which they wore when they were not eating. Lewis said the masks worn by inmates were like the ones he wore—he said they were "like a

---

[7] Lewis explained that "everything started to change a lot" at the Jail after the federal lawsuit was filed. He said that "previously we were told not to wear masks because it might spook the inmates."

painter's mask." If inmates needed a replacement mask, they could request one from the sergeant.

Dr. Robert Cohen, one of appellees' experts, acknowledged during his testimony that the CDC's guidance "recognizes that N[-]95s may not be available" in a jail setting, although they were recommended. He stated that non-N-95 masks were "very helpful" in blocking the droplets that spread the virus, though they are not as effective as N-95 masks.

### E. The CDC's Interim Guidance

Appellees bring numerous complaints regarding how the Jail responded to the COVID-19 pandemic. In stating these claims against the Sheriff, appellees rely on the CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," published on their website in March 2020 and periodically updated. *See* Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (updated May 6, 2021) (last visited May 11, 2021)). Their petition refers, for example, to the CDC's recommendation of social distancing as a cornerstone of any strategy to prevent the spread of COVID-19 in a jail setting. Yet the CDC's interim guidance, which is cited throughout appellees' petition, assumes some modification of its social distancing recommendations will be necessary in institutional settings. In bold-face type on the

second page, it states that "**[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions**." *See id.* at 2. This principle is repeated throughout the document. *See id.* at 4 ("Although this guidance does not specifically reference individuals in every type of custodial setting . . . , facility administrators can adapt this guidance to apply to their specific circumstances as needed."); *id.* at 5 ("The majority of the guidance . . . is designed to be applied to any correction or detention facility, either as written or with modifications based on a facility's individual structure and resources."); *id.* at 29 ("Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs."). Indeed, the guidance is full of qualifiers and non-mandatory language. *See, e.g.*, *id.* at 14 ("*If space allows*, reassign bunks to provide more space between individuals, *ideally* 6 feet or more in all directions.") (emphasis added); *id.* at 18 ("*If possible*, consider quarantining all new intakes for 14 days before they enter the facility's general population. . .") (emphasis added).

Additionally, in the section recommending the implementation of social distancing in jails, the guidance says "*ideally*" there should be "6 feet between all individuals"; that "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff"; and that "[n]ot all strategies will be feasible in all facilities." *Id.* at 13 (emphasis added). It also says that "[w]hen

*feasible and consistent with security priorities*, encourage staff to maintain a distance of 6 feet or more from an individual with COVID-19 symptoms." *Id*. at 15 (emphasis added). The CDC recommends no-cost access to soap, and it advises liquid or foam soap "*when possible*," but if bar soap is used "[e]nsure a sufficient supply of soap for each individual," and "that individuals are not sharing bars of soap." *Id*. at 9 (emphasis added). Alcohol-based hand sanitizer containing at least 60 percent alcohol is recommended "*where permissible based on security restrictions*." *Id*. at 9 (emphasis added). And the CDC advises minimizing "the number of individuals housed in the same room *as much as possible*." *Id*. at 14 (emphasis added).

Regarding face masks, the guidance says N-95 respirators are "*preferred*," but that "surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand." *Id*. at 32 (emphasis added). It further advises that "[d]uring this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which would pose the highest exposure risk." *Id*.

### G. Federal Authorities Cited by Appellees

In a letter filed after the Sheriff filed her reply brief, appellees brought to our attention three decisions from federal courts that they assert are contrary to the Sheriff's argument that appellees have not alleged viable constitutional claims.

We have reviewed these authorities and find them unconvincing. In *Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020), the Seventh Circuit held that the district

court in that case could consider the CDC's guidelines in deciding what, if any, preliminary injunctive relief to order. However, the court noted that "[t]he CDC Guidelines—like other administrative guidance—do not themselves set a constitutional standard." *Id*. And the court reversed the part of the district court's preliminary injunction precluding "double celling and group housing." *Id*. at 813, 819. The court found the district court "failed to afford proper deference to the Sheriff's judgment in adopting policies necessary to ensure safety and security in the Jail," and that it "erred by narrowly focusing its objective reasonableness analysis almost exclusively on social distancing instead of considering the totality of facts and circumstances, including all of the Sheriff's conduct in responding to and managing COVID-19." *Id*. at 819.

We are similarly skeptical of appellees' reliance on *Valentine v. Collier*, 490 F.Supp.3d 1121 (S.D. Tex. 2020), a putative class action brought by individuals incarcerated at the Wallace Pack Unit of the Texas Department of Criminal Justice (TDCJ). In that case, the district court granted a permanent injunction after finding the defendants had been deliberately indifferent to the plaintiffs' medical needs by recklessly disregarding obvious and known risks to inmate health and safety. *Id*. at 1166–67. Yet the Fifth Circuit granted a motion to stay the permanent injunction pending appeal, stating, among other things, that although, "[a]s a matter of policy, TDCJ could have done more to protect vulnerable inmates in the Pack Unit," "federal judges are not policymakers" and "[t]he Eighth Amendment does not

–28–

mandate perfect implementation." *Valentine v. Collier*, 978 F.3d 154, 165 (5th Cir. 2020) ("[T]he narrow question before us is whether Plaintiffs have proven a constitutional violation," and "[u]nder governing precedent, their burden is 'extremely high.'").[8]

Appellees also cite a Ninth Circuit opinion regarding COVID-19, *Hernandez Roman v. Wolf*, 977 F.3d 935, 938 (9th Cir. 2020), an appeal from a class certification and preliminary injunction entered by a federal district court in response to the plaintiffs' claims that conditions at an immigration processing center placed them at unconstitutional risk of contracting COVID-19. The Ninth Circuit agreed with the district court that the government likely failed to provide reasonably safe conditions to detainees because of a lack of social distancing and inadequate hygiene. *Id*. at 944. However, the court also noted that the district court made detailed factual findings in support of the injunction, and the government did not challenge these findings on appeal as clearly erroneous:

> For instance, the district court accepted as true Plaintiffs' declarations and other evidence that the following conditions were present at Adelanto: the Government had failed to impose social distancing because there were "too many detainees at Adelanto for its size"; newly arrived detainees were either mixed with the general population or housed with other new detainees who had arrived at different times,

---

[8] The Fifth Circuit had previously stayed a preliminary injunction entered by the same district court, observing that the TDCJ had "taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus." *Valentine*, 956 F.3d at 803. "Although the district court might do things differently, mere 'disagreement' with TDCJ's medical decisions does not establish deliberate indifference." *Id*. (citing *Cadena*, 946 F.3d at 729). More recently, the Fifth Circuit addressed the merits of the appeal, reversing the district court's judgment and rendering judgment for the defendants. *See Valentine v. Collier*, 993 F.3d 270, 277 (5th Cir. 2021).

both of which undermined the ostensible 14-day quarantine period for new arrivals; staff were not required to wear gloves and masks; there was a lack of necessary cleaning supplies, which led some detainees to clean their toilets with shampoo or to clean common areas using only a dirty towel and bucket of dirty water; given the inadequate supplies, the cleaning of communal spaces was "haphazard, at best"; there were only three functioning showers for 118 women; there was inadequate access to hand sanitizer because dispensers were often empty and detainees had to wait for days to receive hand soap; and detainees were forced to sleep within six feet of each other due to the positions of their beds.

*Id*. at 942–43. Such conditions are distinguishable from the current conditions of confinement at the Dallas County Jail, as shown by appellees' pleadings. According to appellees' pleadings, the Jail's efforts to prevent the spread of COVID-19 are far different than the circumstances in the facility at issue in *Hernandez Roman*.

## H. Appellees Have Not Pleaded a Viable Constitutional Claim

In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court rejected the argument that prison conditions must reflect those set forth in the American Public Health Association's Standards for Health Services in Correctional Institutions, the American Correctional Association's Manual of Standards for Adult Correctional Institutions, or the National Sheriffs' Association's Handbook on Jail Architecture. *Id*. at 543 n.27. According to the Court, "while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Id*. The Court also cautioned that courts defer to administrators on matters of jail administration "not merely because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge, but also because the

–30–

operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id.* at 548; *see also Block v. Rutherford*, 468 U.S. 576, 584 (1984) (noting "the very limited role that courts should play in the administration of detention facilities").

We follow a similar course in this case. The CDC's guidelines are recommendations, not pronouncements. They were "not promulgated pursuant to a formal notice and comment rulemaking process," and the qualified, non-mandatory language used throughout the document indicates the CDC did not intend to bind facilities through its guidance. *See A.S.M. v. Warden, Stewart Cty. Det. Ctr.*, 467 F.Supp.3d 1341, 1354–55 (M.D. Ga. 2020). And those guidelines have been far from static during the COVID-19 pandemic; they evolved as medical professionals learned more about the virus. *See Sanchez v. Brown*, 2020 WL 2615931, at \*18 ("[O]n April 3, 2020, the CDC reversed its previous advice and began recommending the general public wear face masks to help prevent the spread of COVID-19."). We should be cautious about elevating recommendations that have evolved over time and that the CDC itself acknowledges may require modification in some institutional settings to the status of a constitutional or legal standard. *See Sanchez v. Brown*, 2020 WL 2615931, at \*18 ("This Court also questions the appropriateness of using its power to turn what are now CDC recommendations into orders that must be complied with under threat of contempt."); *see also Bell*, 441 U.S. at 543 n.27.

The conduct alleged here does not, as a matter of law, state a viable constitutional claim. Appellees do not dispute that the Sheriff and the Jail have taken some steps to control the spread of COVID-19 in the Jail. Indeed, testimony incorporated into appellees' petition shows the Jail is providing them with no-cost access to bar soap, paper towels, and unspecified disinfectants and detergents. Bleach is not always available, but the Jail has had more of it on hand recently, along with disinfectant wipes and hand sanitizer, and this, too, when available, is provided to inmates at no cost. Inmates who perform janitorial tasks at the Jail wear both gloves and masks while they do their cleaning work. Jail staff have PPE such as face masks and gloves, which are replaced as needed, and all inmates wear face masks except when they are eating. There are kiosks where inmates can talk with people for free by video conference, and the Jail checks employees' temperatures before they begin their shifts.

Appellees, however, contend the Sheriff and the Jail must do more. In other words, they must take additional steps to ensure social distancing under the CDC's guidelines; increased testing for COVID-19; increased supply and use of PPE; additional training on COVID-19; increased cleanliness at the Jail. Yet appellees have not cited, nor have we found, authority mandating their preferred version of social distancing or any of the additional steps they claim the Sheriff and the Jail must take. As other courts have noted, the CDC's guidelines do not set a constitutional standard. *See, e.g., Hope v. Warden York Cty. Prison*, 972 F.3d 310,

327 (3d Cir. 2020) (noting that the "[p]etition and supporting declarations" in the case "described as 'ideal' the social distancing parameter of six feet," but the district court erred in making "that 'ideal' a sine qua non of constitutional detention for individuals at higher risk of serious harm if they contract COVID-19."); *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020) (noting that when prison officials are "doing their best balancing social distancing and regulation applicable to the facility" they do not exhibit deliberate indifference, particularly when the CDC's own guidance "presupposes that some modification of its social-distancing recommendations will be necessary in institutional settings."); *cf. Mays*, 974 F.3d at 823. Still other courts have observed that the use of specific PPE like N-95 masks is not required by the CDC *or* the Constitution. *See Blake v. Tanner*, No. 3:20-cv-1250-G-BN, 2020 WL 3260091, at *3 (N.D. Tex. May 20, 2020) (report and recommendation of U.S. Magistrate Judge), *adopted*, 2020 WL 3259369 (N.D. Tex. June 16, 2020); *Bodnar v. Lake Cty. Jail*, No. 2:20-CV-157-PPS-APR, 2020 WL 1940742, at *2 (S.D. Ind. Apr. 22, 2020). The CDC's guidelines regarding COVID-19 are, to put it simply, not legally binding on the Jail. *See Emanuel Lewis v. Dallas Cty. Sheriff Marian Brown*, No. 05-20-00855-CV, 2021 WL 1783106, at *4 n.6 (Tex. App.—Dallas May 5, 2021, no pet. h.) (mem. op.).[9] That the Dallas County

---

[9] And because the CDC's guidelines are not legally binding on the Jail, any dispute among fact witnesses at the federal hearing regarding, for example, whether social distancing was possible at the Jail is not material to a determination of the Sheriff's jurisdictional plea.

Jail's policies on screening and protecting inmates, its procedures for testing and quarantining, or other protective measures for managing the COVID-19 pandemic do not conform in every respect with the CDC's guidance or with appellees' preferences is not a basis for concluding their constitutional rights have been violated.[10]

We conclude appellees' claims under the Texas Constitutional are facially invalid, fail as a matter of law, and therefore do not, as pleaded, support a waiver of sovereign immunity. *See, e.g., Klumb*, 458 S.W.3d at 13.

## IV. Ultra Vires Claims

Turning to the Sheriff's first issue, appellees support their ultra vires claims against the Sheriff by pointing to various Texas statutory and regulatory provisions and alleging the Sheriff is either acting contrary to mandatory statutory duties or failing to perform ministerial acts required by statute. The Sheriff contends she is

---

[10] Testimony from the federal hearing not incorporated into the second amended petition (yet incorporated into the original and first amended petitions) goes further in explaining specific steps the Jail has taken regarding the COVID-19 pandemic. Appellees argue the Sheriff cannot rely on this testimony because it was not incorporated into their live pleading, their second amended verified petition. Appellees point to rule 65 of the rules of civil procedure and argue their second amended petition superseded and replaced the original and first amended petitions. *See* TEX. R. CIV. P. 65. The Sheriff argues appellees' abandoned pleadings and the testimony incorporated into them should be treated as admissions. It is true that statements in abandoned pleadings may be accorded evidentiary value, although they are not conclusive. *See Louviere v. Hearst Corp.*, 269 S.W.3d 750, 755 (Tex. App.—Beaumont 2008, no pet.); *Martinez v. Midland Credit Mgmt., Inc.*, 250 S.W.3d 481, 485–86 (Tex. App.—El Paso 2008, no pet.); *see also Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234–35 (Tex. 2007); *Matter of Marriage of I.C. & Q.C.*, 552 S.W.3d 291, 295 (Tex. App.—Dallas 2016); *McCormick v. Stowe Lumber Co.*, 356 S.W.2d 450, 457 (Tex. Civ. App.—Austin 1962, writ ref'd n.r.e.). But there is no indication in the record this issue was ever brought to the trial court's attention, and the Sheriff does not cite any authority holding that such an issue may be raised for the first time on appeal. We conclude that we need not address this question because, based on the facts alleged in appellees' live pleading and the relevant law, appellees' claims fail as a matter of law.

immune from suit for her decisions and actions arising from the operation of the Jail and her management of the COVID-19 crisis. The following table summarizes the key provisions at issue:

| Statutory or Regulatory Provision | Relevant Text |
|---|---|
| TEX. HEALTH & SAFETY CODE § 341.011(12) | "Each of the following is a public health nuisance: . . . an object, place, or condition that is a possible and probable medium of disease transmission to or between humans." |
| TEX. HEALTH & SAFETY CODE § 341.012(a) | "A person shall abate a public health nuisance existing in or on a place the person possesses as soon as the person knows that the nuisance exists." |
| TEX. LOC. GOV'T CODE § 351.010(4) | "A county jail must be: . . . maintained in a clean and sanitary condition in accordance with standards of sanitation and health." |
| 37 TEX. ADMIN. CODE § 273.3 | "All medical instructions of designated physicians shall be followed." |
| 37 TEX. ADMIN. CODE § 275.1 | "Every facility shall have the appropriate number of jailers at the facility 24 hours each day. Facilities shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every 60 minutes. . . ." |
| 37 TEX. ADMIN CODE § 275.4 | "Inmates shall be supervised by an adequate number of jailers to comply with state law and this chapter. One jailer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than 1 jailer per 48 inmates or increment thereof on each floor for direct inmate supervision. . . ." |
| 37 TEX. ADMIN. CODE § 279.3 | "Preventive maintenance, to include necessary repairs, shall be conducted to ensure a safe, secure, and sanitary |

| facility." |
|---|

## A. Public Health Nuisance

Appellees allege Sheriff Brown acted ultra vires in failing to abate a public health nuisance at the Jail. They argue the Sheriff failed to perform a mandatory duty that she "shall abate" the "public health nuisance at the Jail. *See* TEX. HEALTH & SAFETY CODE § 341.012(a). The Health and Safety Code defines a nuisance, in part, as "an object, place, or condition that is a possible and probable medium of disease transmission to or between humans." TEX. HEALTH & SAFETY CODE § 341.011(12). The legal duty to abate a public health nuisance derives from section 341.012(a). *See id.* § 341.012 ("Abatement of Nuisance"). But that statute specifies a particular enforcement mechanism: a local health authority must send a notice to abate the nuisance that specifies "the nature of the public health nuisance and designate[s] a reasonable time within which the nuisance must be abated." *Id.* § 341.012(b)–(c). If the nuisance is not abated within the specified time, the prosecuting attorney or the attorney general can institute proceedings to abate the nuisance. *Id.* § 341.012(d). Appellees have not cited, and we have not found, a provision authorizing a private enforcement action of the kind brought here to abate a public health nuisance, or a waiver of immunity for such an action.

And even if we assume the Jail is a public health nuisance, the abatement of such a nuisance requires the exercise of discretion, deliberation, and judgment. Regarding Sheriff Brown's duties, the Local Government Code provides:

(a) The sheriff of each county is the keeper of the county jail. The sheriff shall safely keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court.

(b) The sheriff may appoint a jailer to operate the jail and meet the needs of the prisoners, but the sheriff shall continue to exercise supervision and control over the jail.

TEX. LOC. GOV'T CODE § 351.041. The responsibility of a county sheriff is necessarily broadly discretionary, in the sense that the daily operation of a jail requires the sheriff to make decisions that require deliberation and the exercise of judgment. *See Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (noting that elected county officials, such as sheriffs, hold "virtually absolute sway over the particular tasks or areas of responsibility entrusted to [them] by state statute and [are] accountable to no one other than the voters for [their] conduct therein."). Moreover, no law of which we are aware of authorizes a county sheriff to release prisoners to abate a public health nuisance. On the contrary, "the Sheriff is legally obliged to execute all lawful process and cannot release prisoners committed to jail by a magistrate's warrant—even if prisoners are committed 'for want of bail.'" *O'Donnell v. Harris Cty.*, 892 F.3d 147, 156 (5th Cir. 2018) (op. on rehearing) (citing TEX. CODE CRIM. PRO. arts. 2.13, 2.16, 2.18; TEX. LOC. GOV'T CODE § 351.041(a)). Bail is set by judicial officers, not county sheriffs, and county sheriffs are required to execute all process and precepts directed to them by legal authority. *See, e.g.,* TEX. LOC. GOV'T CODE §§ 85.021, 85.022; TEX. CODE CRIM. PROC. art. 17.15; *see also Henry S. Miller Co. v. Evans*, 452 S.W.2d 426, 433–34 (Tex. 1980)

("'A sheriff is an officer of the court, under a duty to execute process [and] is not a tribunal to determine doubtful questions of fact.'") (quoting *Harston v. Langston*, 292 S.W. 648, 650 (Tex. Civ. App.—Austin 1927, no writ)). The Local Government Code provides, as appellees point out, that "the sheriff of each county is the keeper of the county jail" and exercises "supervision and control" over it, but the statute specifies that the sheriff's lawful authority is "subject to an order of the proper court." TEX. LOC. GOV'T CODE § 351.041(a)–(b).

Appellees' pleadings demonstrate that their claims against the Sheriff do not fall within the narrow ultra vires exception. Regarding testing, for example, appellees rely on general allegations such as "[t]esting for COVID-19 is essential to determining how far it has spread," but the specific allegation is that "[t]he only people who get tested are people who are symptomatic and for some reason or another come to the attention of Parkland and who Parkland chooses to test." As appellees allege, Parkland is responsible for the health care of inmates at the Jail, including COVID-19 testing. Appellees also allege Parkland medical personnel are making decisions about when and why to perform medically diagnostic testing on inmates, but such an allegation is inconsistent with the Sheriff having acted outside of her lawful authority or contrary to a valid statute.

Additionally, none of the statutes appellees are relying on—not sections 341.011 and 341.012 of the Health and Safety Code or section 351.041 of the Local Government Code—require the Sheriff to act with the requisite certainty or

specificity. *Houston Mun. Employees' Pension Sys*., 549 S.W.3d at 576. And appellees have not cited any law requiring a county sheriff to use every available bed at the jail, or available space at the jail; mandating who must be tested for COVID-19 at the jail or who must clean it; or specifying what cleaning products or supplies must be purchased and provided to inmates. Nor do they point to a statute or regulation requiring that specific forms of PPE be purchased, that it be stocked in certain quantities, or that it be made available at certain locations in the Jail. Therefore, we conclude sections 341.011, 341.012, and 351.041 do not, as alleged here, support an ultra vires claim against the Sheriff.

### B. Maintaining Jail in Clean and Sanitary Condition

Appellees contend the Sheriff acted ultra vires in failing to comply with section 351.010(4) of the Local Government Code, which states that a county jail must be "maintained in a clean and sanitary condition in accordance with standards of sanitation and health." TEX. LOC. GOV'T CODE § 351.010(4). However, decisions related to sanitation and safety at jail facilities necessarily require the exercise of deliberation and judgment. To name one example, decisions about what cleaning supplies to purchase for a jail (and in what quantities) require discretion and deliberation, particularly during a global pandemic. Section 351.010, as worded, leaves considerable discretion to a sheriff regarding how to perform his or her duties. *See Scott v. Britton*, 16 S.W.3d 173, 178–79 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (holding that statute establishing generic duty to provide safe confinement

–39–

for inmates was "'not sufficiently specific so as to leave no choice to an officer in the performance of these duties,'" such that promulgation of policies and procedures for safe transportation of inmates would be a ministerial function for purposes of official immunity) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 655 (Tex. 1994)).

Appellees, moreover, do not argue that no cleaning supplies or products are available at the Jail. They allege there are no *CDC-recommended* bleach-based cleaners; there are no alcohol wipes or other disinfectant wipes; there is no liquid soap. They also do not argue the Jail is not being cleaned—they allege the inmates, instead of professional cleaning crews, are cleaning the Jail. But appellees have not cited, nor have we found, a provision requiring the Sheriff to provide their preferred cleaning products or supplies. And they do not cite any authority that requires the Sheriff to use professional cleaning crews to clean the tanks or pods at the Jail, rather than inmates or DSOs. The Sheriff does not act ultra vires merely by purchasing different cleaning products in different quantities than appellees would prefer, nor is it ultra vires if she assigns the cleaning responsibilities in the Jail differently.

Because there is broad discretion in how to maintain a clean and sanitary jail facility, we conclude section 351.010 does not, as alleged, support an ultra vires claim against the Sheriff.

### C. Medical Instructions of Designated Physicians

Appellees also allege the Sheriff acted ultra vires in failing to follow "[a]ll

medical instructions of designated physicians." *See* 37 TEX. ADMIN CODE § 273.3. Appellees, however, do not specify any medical instruction by a "designated physician" aimed at diagnosing, treating, or attempting to cure a physical or mental condition. Their petition cites Dr. Nijhawan's letter (quoted earlier) recommending the release of certain inmates in the Jail. Appellees also point to the stated desire, as alleged in their petition, of an administrator of medical services at the Jail to conduct additional testing at the Jail, and to the stated belief of Parkland Hospital Vice President for Correctional Health Services, Patrick Jones, that reducing population density in the Jail is a "feasible" response to the danger of COVID-19 infection in the Jail.

As far as Jones is concerned, however, appellees do not allege he is a physician within the meaning of 37 Texas Administrative Code section 273.3. Indeed, according to his testimony at the federal hearing (as shown in the original and second amended petitions), he is an administrator and does not have a medical degree. Appellees also do not claim Dr. Nijhawan is a designated physician within the meaning of section 273.3. And Dr. Nijhawan's letter—recommending the Sheriff and county officials *consider* releasing certain inmates—cannot reasonably be considered a medical instruction imposing any mandatory legal duty on the Sheriff. In addition, as we stated earlier, Texas law does not authorize county sheriffs to release persons confined pursuant to facially valid court orders by unilaterally determining what circumstances warrant release. *See O'Donnell*, 892

–41–

F.3d at 156. A recommendation from Dr. Nijhawan that the Sheriff and county officials consider releasing certain inmates is just that, a recommendation, and it cannot be reasonably construed as a medical instruction imposing any mandatory legal duty on Sheriff Brown. The same is true for an administrator's stated desire that more testing occur at the Jail. Such allegations do not support an ultra vires claim against the Sheriff.

### D. Jail Staffing

Another argument made by appellees is that the Sheriff acted ultra vires in inadequately staffing the Jail. This contention is rooted, like much of appellees' complaint, in the CDC's recommendation of social distancing to prevent the spread of COVID-19. Appellees cite a provision in the TAC providing that "[e]very facility shall have the appropriate number of jailers at the facility 24 hours each day," and that jail facilities "shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every 60 minutes." 37 TEX. ADMIN. CODE § 275.1 ("Regular Observation by Jailers"). Appellees also cite a TAC provision that "[o]ne jailer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than 1 jailer per 48 inmates or increment thereof on each floor for direct inmate supervision." *Id*. § 275.4 ("Staff").

Appellees maintain that the provisions of the TAC, put in place by the Texas Commission on Jail Standards, apply to the Sheriff and impose mandatory duties upon her. *See, e.g.*, TEX. GOV'T CODE ANN. § 511.009(a)(1) (authorizing Texas

Commission on Jail Standards to adopt reasonable rules and procedures establishing minimum standards for, among other things, the operation of county jails). Notably, however, at least as far as sections 275.1 and 275.4 are concerned, appellees do not allege the staffing levels in the Jail fall below the regulatory threshold. In fact, they state in their petition that "rounds" in the Jail are conducted "at least every 44 minutes" during eight-hour shifts,[11] which is within the regulatory requirements. *See id.* § 275.1.

Appellees argue the Sheriff is understaffing the jail because there are too many inmates housed together in multi-occupancy tanks or pods, but the TAC specifies the living space requirements for lockup, medium-security, and minimum-security facility design, construction, and furnishing. It requires "not less than 40 square feet of clear floor space for the first bunk plus 18 square feet of clear floor space for each additional bunk." *See id.* §§ 259.134, .135, .231, .232, .328, .329, .428, .429. "Day Rooms" must likewise "contain [ ] not less than 40 square feet of clear floor space for the first inmate plus 18 square feet of clear floor space for each additional inmate." *Id.* § 259.136, .233, .330, .430. Appellees do not complain the Jail is not adhering to statutory or regulatory living space requirements.

Appellees also argue that following the CDC's social distancing guidance at

---

[11] Appellees allege in their petition: "In each of the Towers, the Sheriff requires DSOs in the Jail to conduct a 'round' at least every 44 minutes during their 8-hour shifts. A round involves walking through the pod or tank in close proximity to everyone detained in the pod or tank at least 10 times each shift."

the Jail requires allowing enough space to permit detained persons, DSOs, and other staff and visitors to remain at least six feet apart "at all times." But no Texas law of which we are aware imposes such a requirement, and the CDC's guidance on this matter states that *ideally* there should be six feet between individuals. *See* Interim Guidance, at 13. Courts should be hesitant, as we noted before, about taking general, recommended guidance from the CDC that, where feasible, social distancing should be practiced, and transform it into a mandate that must be reflexively enforced at all times. And the CDC's guidance notwithstanding, appellees have not cited, nor have we found, precedent authorizing a court to impose a higher standard than that prescribed by applicable statutes or regulations, and then hold that higher standard supports an ultra vires claim. Thus, appellees have again failed to allege an ultra vires claim against the Sheriff.

### E. Preventive Maintenance

Another argument made by appellees is that the Sheriff acted ultra vires in not conducting preventive maintenance to ensure a safe, secure, and sanitary jail facility. *See* 37 TEX. ADMIN. CODE § 279.3. Section 279.3, entitled "Facility Maintenance," states that "[p]reventive maintenance, to include necessary repairs, shall be conducted to ensure a safe, secure, and sanitary facility." *Id.* Chapter 279 of the TAC, which includes this provision as well as two others, 279.1 ("Sanitation Plan") and 279.2 ("Specificity"), addresses sanitation in jail facilities. *See id.* § 279.1 (providing that in part that "[e]ach facility shall have and implement a written plan,

reviewed and approved by the commission, for the maintenance of an acceptable level of cleanliness and sanitation throughout the facility."); § 279.2 (providing that "[s]uch plan shall specify how and by whom the foregoing provisions are to be met.").

What constitutes "[p]reventive maintenance" under section 279.3 is not defined, but the duty to make preventative repairs on a jail facility is necessarily broad. Deciding what to repair in a jail, or when and how to make repairs, requires the exercise of discretion and deliberation. Moreover, appellees do not specify what preventive maintenance—apart from general cleaning of the Jail—should be done, or at what intervals. Nor do they allege any specific components of the Jail are in disrepair. The CDC's guidelines—on which appellees place so much reliance—are, as we noted before, *recommendations*; they allow for adaptation based on individual facilities' physical space, staffing, and population needs. *See* Interim Guidance, at 2. We conclude that, to the extent section 279.3 prescribes or defines any duty by the Sheriff to act, it does not do so with the requisite precision or certainty to support an ultra vires claim against the Sheriff in this case.

## F. Precedent Cited by Appellees

In their brief, appellees argue that "the mere fact that the Sheriff has options for *how* to maintain the jail in a clean and sanitary condition does not vest her with any option to ignore her statutory obligation to do so." They direct us to *City of Houston v. Houston Mun. Employees' Pension Sys.*, 549 S.W.3d at 566, to support

their argument that the statutes and regulations they cite impose mandatory or ministerial duties on the Sheriff. But their reliance on *Houston Municipal* is misplaced. The issue in that case was whether the City was fulfilling its obligation to make contributions to a pension fund established for certain employees and administered by a pension system. *Id.* at 570. Under the governing statute, the court recognized "the City *must* make contributions to the pension fund and pick-up payments on behalf of employees." *Id.* at 571 (emphasis added).

During the long-running dispute between the City and the pension system, "the City did not make contributions to fund the pension plan for" certain employees. *Id.* at 573. The City argued the pension system's ultra vires claims were barred because it had discretion to determine whether those individuals were members of the pension system. *Id.* at 581. The Texas Supreme Court, however, agreed with the pension system that it was "not seeking relief regarding *how* the payments must be made, but, rather, *whether* the payments must be made." *Id.* at 582. The court explained that the governing statute, article 6243h of the revised civil statutes, mandated that contribution payments must be made by the City. *Id.* That statute stated that the City "shall provide full and timely information" to the pension system and "shall make contributions" to the pension system. *Id.* (quoting TEX. REV. CIV. STAT. art. 6243h, §§ 2(u), 8A(a))). Thus, the statute created a ministerial duty. *See id.* The court narrowed the inquiry as to whether the City's duties were discretionary or ministerial, as follows:

> The controversy here is not about how the City must make the payments, only whether it must. The statute *leaves no room for the City to exercise judgment* regarding whether the payments must be made. Accordingly, we hold that article 6243h creates mandatory duties and defines them with sufficient clarity to support the Pension System's ultra vires and mandamus claims.

*Id.* at 582 (citations omitted) (emphasis added).

Appellees argue *Houston Municipal* supports subject matter jurisdiction because in this case, as in *Houston Municipal*, "[t]he question is not **how** the Sheriff must abate the public health nuisance in the Dallas County jail, but rather **whether** she must do so under the statute." Appellees assert that "[t]he nuisance statute uses mandatory language," e.g., "[a] person *shall abate* a public health nuisance. . . ," TEX. HEALTH & SAFETY CODE § 341.012(a) (emphasis added), and appellees add that "[t]he Sheriff must comply." But unlike *Houston Municipal*, the instant case does not involve any statutes or regulations that "leave[ ] no room" for Sheriff Brown to exercise judgment. The statutes and regulations cited by appellees do not require the Sheriff to act with such certainty or specificity as found in article 6243h. Further, although appellees argue Sheriff Brown has ignored her legal duties, the facts alleged in their petition show, as discussed above, that the Sheriff has taken some actions to fulfill her duties. Thus, unlike *Houston Municipal*, the issue here is not *whether* Sheriff Brown fulfilled her duties as Sheriff but *how* the Sheriff fulfilled those duties. Sheriff Brown's exercise of her statutory authority in serving as the "keeper of the county jail," with authority to supervise, direct, or control the daily operation of the county jail, is an exercise of her discretionary powers. *See* TEX.

–47–

LOC. GOV'T CODE § 351.041.

Nor are we persuaded by appellees' citation of *Dallas Cty. Hosp. Dist. v. Sosa*, No. 05-19-01164-CV, 2020 WL 4581666 (Tex. App.—Dallas Aug. 10, 2020, pet. filed) (mem. op.). In that case, we held the plaintiff's petition properly pleaded ultra vires claims because it alleged, among other things, that David S. Lopez, Parkland Hospital's chief operating officer, lacked the statutory authority to authorize a hospital lien for services that exceeded a reasonable and regular rate for the services—in direct contravention of section 55.004(c), (d)(1) of the Texas Property Code. *Id.* at **6–7.

Appellees' petition does not assert the same kind of ultra vires claim. They do not point to a specific statute or regulation and claim the Sheriff acted beyond or outside of her authority in a way that is analogous to tacking on unreasonable and non-customary charges to a hospital lien amount, as in *Sosa*, *see id.*; not making required contributions to a pension system, as in *Houston Municipal*, *see Houston Mun. Employees' Pension Sys.*, 549 S.W.3d at 582; or using aerial photography when digital map data was required, as in *Houston Belt & Terminal Ry. Co.*, 487 S.W.3d at 169.

In *Houston Belt*, for example, another case cited by appellees, the court considered an ultra vires claim against Houston's Director of Public Works and Engineering. As the Texas Supreme Court explained in *Hall v. McRaven*:

In *Houston Belt*, we examined an *ultra vires* claim against Houston's

–48–

Director of Public Works and Engineering. *Id*. at 158. The plaintiff complained that the Director acted ultra vires in imposing a drainage fee based on an unlawful determination of the permeability of the plaintiff's property. *Id*. at 159. The ordinance authorizing the Director to act *commanded him to make that permeability determination "on the basis of digital-map data . . . or other similar reliable data as shall be determined by the director*." *Id*. Instead of using digital map data, or something similar, the Director looked at aerial photographs to make his permeability determination. *Id*. We found that while the ordinance gave some discretion to the Director, the discretion was not absolute. *Id*. at 168. Therefore, the Director's misinterpretation of his own limits in making a permeability determination was a valid basis for an ultra vires claim. *Id*. at 169.

*Hall*, 508 S.W.3d at 241 (emphasis added) (citing *Houston Belt*, 487 S.W.3d at 158–169).

## G. Sheriff Brown's Alleged Acts Are Not Ultra Vires

The situation in the present case is quite different from *Houston Belt*, *Sosa*, or *Houston Municipal*. Appellees' claims are based on the Sheriff's exercise of discretion, not whether she failed to perform a ministerial duty. Nor do their pleadings point to a specific statute or regulation that shows the Sheriff acted beyond her legal authority or without legal authority. Appellees do not dispute that Sheriff Brown is the keeper of the Jail, authorized to safely keep all prisoners committed to the Jail by a lawful authority, but their briefing directs us to no action required by statute or regulation that she failed to perform. Appellees also do not point to facts showing the Sheriff misinterpreted the enabling law that creates the authority for her to act; that she acted in conflict with the law that authorizes her to act; that she violated state law; or that she otherwise acted without lawful authority.

–49–

We conclude Sheriff Brown's alleged actions are not ultra vires. Accordingly, appellees have not pleaded actionable ultra vires claims against Sheriff Brown.

## V. Texas Tort Claims Act

## A. Injunctive relief under the TTCA

In her third issue, the Sheriff argues she is also immune from suit for appellees' claims under the TTCA. This argument has three sub-parts: (1) the TTCA does not waive governmental immunity for claims for injunctive relief; (2) the TTCA does not apply to the discretionary acts of governmental officials; and (3) appellees' allegations regarding the use of property under the TTCA are insufficient as a matter of law.

Beginning with the first argument, the TTCA specifies that "[l]iability of the state government under this chapter is limited to money damages in a maximum amount of $250,000 for each person and $500,000 for each single occurrence for bodily injury or death and to $100,000 for each single occurrence for injury to, or destruction of, property." TEX. CIV. PRAC. & REM. CODE § 101.023(a). As this court recently stated, we find no other section of the TTCA that even addresses, much less permits, injunctive relief against a governmental unit. *See Emanuel Lewis*, 2021 WL 1783106, at *6. Furthermore, the TTCA "waives immunity only to the extent of liability created by this chapter." TEX. CIV. PRAC. & REM. CODE § 101.025(a). A statutory waiver of sovereign immunity must be construed narrowly, and statutory language waiving immunity must be clear and unambiguous. *In re Smith*, 333

S.W.3d 582, 587 (Tex. 2011); *see also* TEX. GOV'T CODE § 311.034 (codifying the clear and unambiguous standard). Where the language of a statute is unambiguous, we interpret the statute according to its plain meaning. *Sunstate Equip. Co., LLC v. Hegar*, 601 S.W.3d 685, 690 (Tex. 2020).

Because the only measure of liability provided by the TTCA is money damages, the TTCA does not waive sovereign immunity for injunctive relief. *See* CIV. PRAC. & REM. CODE § 101.023; *Emanuel Lewis*, 2021 WL 1783106, at *6 (TTCA did not afford Dallas County Jail DSO avenue to pursue injunctive relief for his negligence claims); *see also Tex. Dep't of Transp. v. Ramming*, 861 S.W.2d 460, 468 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (holding that the exclusive mode and measure of liability for which the State is willing to waive sovereign immunity is for money damages). We conclude, then, that because appellees seek only injunctive relief in this suit, the limited waiver of immunity in the TTCA does not apply, and appellees' tort claims must be dismissed.

### B. Discretionary Function Exclusion

Furthermore, were we to conclude the TTCA waived immunity such that appellees could proceed with injunctive relief under their tort claims, the TTCA does not waive a governmental unit's immunity for a claim based on either (1) "the failure of a governmental unit to perform an act that the unit is not required by law to perform"; or (2) "a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law

–51–

leaves the performance or nonperformance of the act to the discretion of the governmental unit." TEX. CIV. PRAC. & REM. CODE § 101.056; *Tarrant Reg'l Water Dist. v. Johnson*, 572 S.W.3d 658, 665 (Tex. 2019). "Section 101.056 preserves immunity 'for the state's failure to act, when no particular action is required by law,'" and "[t]he exception 'avoid[s] judicial review or interference with those policy decisions committed to the other branches of government.'" *Tarrant Reg'l Water Dist.*, 572 S.W.3d at 665 (citation omitted) (quoting *Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 657 (Tex. 2007)). As discussed above, appellees attempt to hold Sheriff Brown liable for claims that are based on either the Sheriff's failure to perform acts that are not required by law and/or actions she has taken under discretionary authority. Consequently, section 101.056 of the TTCA bars appellees' claims. *See Emanuel Lewis*, 2021 WL 1783106, at *7. We conclude the TTCA does not waive Sheriff Brown's immunity for appellees' tort claims. We do not reach the Sheriff's third sub-issue.

## VI. Appellees' Opportunity to Amend Their Pleadings

Because we are sustaining the Sheriff's issues on appeal, we must decide whether remand, as requested by appellees, or rendition of a judgment dismissing the claims, as requested by the Sheriff, is the appropriate remedy. Appellees argue they should be given an opportunity to amend their pleadings to address any remaining immunity issues.

Generally, we allow a litigant to amend his or her pleadings to cure defects

when the pleadings do not allege sufficient jurisdictional facts but do not affirmatively negate jurisdiction. *Texas Dept. of Transportation v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002). Like *Ramirez*, however, this is not a pleadings-defect case. *Id*. The pleadings here affirmatively negate the existence of subject matter jurisdiction. *See Miranda*, 133 S.W.3d at 226–27. And, practically speaking, appellees have already had two opportunities to replead, to no avail. Appellees twice amended their petition after the hearing on the Sheriff's plea to the jurisdiction. Appellees have, therefore, already had opportunities to amend their pleadings to cure the jurisdictional defects raised in the Sheriff's plea. Given the insurmountable jurisdictional defects asserted by the Sheriff, appellees do not need, and they are not entitled to, another opportunity to re-plead.

## VII. Conclusion

We conclude appellees' pleadings affirmatively negate the existence of jurisdiction. We sustain the Sheriff's issues, reverse the trial court's denial of the plea to the jurisdiction, and render judgment dismissing appellees' claims against the Sheriff for lack of subject matter jurisdiction.


/Lana Myers//
LANA MYERS
JUSTICE

–53–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DALLAS COUNTY SHERIFF MARIAN BROWN, IN HER OFFICIAL CAPACITY, Appellant

No. 05-20-00579-CV     V.

DAVID DANIELS, JODIE CAMPBELL, AND KELLIE MCCULLAR, ON BEHALF OF THEMSELVES AND A CLASS OF MEDICALLY-VULNERABLE PERSONS, Appellees

On Appeal from the 298th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-20-07112. Opinion delivered by Justice Myers. Chief Justice Burns and Justice Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** dismissing the claims of appellees DAVID DANIELS, JODIE CAMPBELL, AND KELLIE MCCULLAR, ON BEHALF OF THEMSELVES AND A CLASS OF MEDICALLY-VULNERABLE PERSONS, for lack of jurisdiction. It is ORDERED that appellant DALLAS COUNTY SHERIFF MARIAN BROWN, IN HER OFFICIAL CAPACITY, recover her costs of this appeal from appellees.

Judgment entered this 19th day of May, 2021.